Filed 5/25/16  Certified for Partial Pub. 6/13/16 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re K.L. et al., Persons Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH AND HUMAN SERVICES DEPARTMENT,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>D.J.,<br><br>　　　Defendant and Appellant. | A145648<br><br>(Marin County Super. Ct. Nos. JV 25305A, JV 25306A, JV 25307A) |
| In re K.L. et al., Persons Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH AND HUMAN SERVICES DEPARTMENT,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>D.J.,<br><br>　　　Defendant and Appellant. | A145970<br><br>(Marin County Super. Ct. Nos. JV 25306A, JV 25307A) |

　　　These consolidated appeals arise from dependency proceedings involving three siblings:  (1) K.L. (Older Brother), a boy born in October 2003, (2) K.L. (Sister), a girl

1

born in November 2005, and (3) K.L. (Younger Brother), a boy born in June 2009. The children were removed from the custody of their mother, D.J. (Mother), in early 2011, and the juvenile court terminated reunification services to Mother later that year. In January 2015, after having spent several years in placements that included a guardianship and foster care, the children were living in three different homes, and the juvenile court determined those placements were appropriate. In May 2015, Mother filed a petition under Welfare and Institutions Code section 388[1] asking the court to modify the children's placements and order that they be placed with their maternal grandmother (Grandmother). The court denied the petition. The court later terminated Mother's parental rights as to Sister and Younger Brother, and selected adoption as the permanent plan for Sister and Younger Brother.

In these consolidated appeals, Mother challenges the order denying her section 388 petition and the order terminating her parental rights as to Sister and Younger Brother. Mother contends (1) the court erred by denying her section 388 petition without holding an evidentiary hearing, (2) there was not clear and convincing evidence Younger Brother was adoptable, and (3) the court should have applied the sibling relationship exception to termination of parental rights set forth in section 366.26, subdivision (c)(1)(B)(v). We affirm the juvenile court's orders.

## I. BACKGROUND

### A. The First Phase of Dependency Proceedings

#### 1. Detention

On February 18, 2011, the Marin County Health and Human Services Department (the Department) filed a juvenile dependency petition on behalf of the children, alleging Mother had failed or was unable to supervise or protect them adequately (see § 300, subd. (b)). According to the petition and a subsequent detention report prepared by the Department, Mother left the children at home unsupervised on the evening of February 16, 2011. Younger Brother (then 20 months old) turned on the gas stove, causing a fire

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise stated.

2

in the apartment. Older Brother (then seven years old) and Sister (then five years old) ran to get help, leaving Younger Brother alone in the apartment. Neighbors were able to put out the fire safely. Neighbors reported (and Older Brother and Sister confirmed) that Mother frequently left the children alone in the home. Younger Brother had been seen wandering around the apartment complex without assistance or supervision. Mother was arrested for felony child endangerment. The children were taken into protective custody and placed in foster care.

Police officers and a social worker who responded to the apartment after the fire reported it was in disarray. The apartment smelled of marijuana, and the officers found marijuana buds and residue in the apartment, some of which were accessible to the children.

The social worker spoke with Mother, who reported that the children's father passed away in August 2009. Mother stated she had been depressed since his death. Mother acknowledged the condition of her home. She acknowledged leaving her children at home unsupervised.

On February 17, 2011, the social worker spoke with the children's maternal aunt (Aunt). Aunt stated she had been concerned about the children for some time. Aunt believed Mother had a problem with marijuana; she had heard from Older Brother and the family's neighbors that Mother frequently left the children alone; and Mother had told Aunt that, just a few days earlier, Younger Brother had wandered out of the apartment while Mother was taking a nap, and a neighbor had found him in the street. Aunt stated she wished to be considered as a placement option for the children, and the Department began the assessment process. Mother supported placement of the children with Aunt.

The Department noted it had received referrals in 2008 and 2009 alleging neglect of the children. Although the Department had found those referrals to be unsubstantiated, the social workers who had investigated the referrals had noted some concerns, including the unkempt condition of the home, Mother's statement she suffered from depression, and her statement she had smoked marijuana since she was a teenager to cope with stress.

3

In its February 2011 detention report, the Department noted these earlier reports "indicat[ed] that [Mother's] substance use and depression have been ongoing issues."

The Department concluded Mother had a history of negligent and inadequate supervision of the children. The Department recommended continued detention of the children until Mother could address the issues that had put the children at risk. On February 22, 2011, consistent with the Department's recommendation, the court ordered the children detained and ordered that reunification services be provided to Mother.

### 2. Jurisdiction and Disposition

On March 21, 2011, the court amended the petition to eliminate an allegation about Mother's use of marijuana, and Mother submitted to the court's jurisdiction based on the amended petition. The court sustained the amended petition and ordered continued visitation and services.

In its April 2011 disposition report, the Department reported the children had been moved to the home of Aunt. At the disposition hearing, the court ordered the children removed from Mother's physical custody. The court ordered the Department to provide reunification services to Mother.

### 3. The Termination of Reunification Services

In an October 2011 report for the six-month review hearing, the Department recommended that reunification services to Mother be terminated. Mother had been evicted from her apartment in September 2011 for failure to pay rent, despite having the means to do so. Mother participated in supervised visits with the children for the first few months after they were detained. But after visitation became unsupervised, Mother's efforts to visit and call the children declined dramatically. Mother failed to submit to drug testing for several months, finally testing negative in October 2011. She failed to remain in therapy. She did not comply with other components of her case plan, including arranging for a physical examination and maintaining a clean and safe home environment for the children.

On October 17, 2011, the court found Mother had made minimal progress in addressing the problems that had led to the children's removal from Mother's custody.

4

The court terminated reunification services to Mother and set a section 366.26 permanency hearing.

### 4. The Guardianship

In its February 2012 report for the section 366.26 hearing, the Department recommended guardianship as the permanent plan for the children. The Department recommended the children remain with Aunt, who wished to serve as their guardian rather than to adopt them. The children's court appointed special advocate (CASA) reported that, in December 2011, Grandmother had moved in with Aunt and the children.

At the section 366.26 hearing on February 22, 2012, the court adopted the Department's recommendation and selected guardianship as the permanent plan for the children. The court appointed Aunt the legal guardian of the children. The court issued letters of guardianship on March 27, 2012.

In August 2012, the Department recommended that the court dismiss the dependency proceedings and order that Aunt remain the guardian of the children. Although Aunt experienced stress from caring for the three children, it appeared to the Department that she was handling the adversity well. On July 31, 2012, Aunt stated that Mother had only visited the children three times since the beginning of 2012. On August 20, 2012, the court dismissed the petition and terminated the dependency proceedings.

## B. The Second Phase of Dependency Proceedings

### 1. The Termination of the Guardianship

In May 2014, the Department filed section 388 petitions seeking reinstatement of dependency proceedings and termination of Aunt's guardianship of the children. In the section 388 petitions and in subsequent reports, the Department stated that, in March 2014, dependency petitions alleging Aunt had physically abused the children had been filed and sustained in Contra Costa County. According to the Department, the court in Contra Costa County sustained an allegation that Aunt "has used inappropriate physical discipline on the child (all 3 children) and the child is frightened to return to the home." While the children were living with Aunt, there were three referrals and five calls of concern about the children's welfare, including allegations that Aunt frequently yelled

5

and cursed at the children, telling them they were stupid and that she hated them. There were also allegations that Aunt had hit the children and pulled Sister's hair. During the proceedings in Contra Costa County, the children were removed from Aunt's home and placed with their godparents. In April 2014, the Contra Costa County Superior Court transferred the matter back to Marin County.

At a hearing on June 30, 2014, the court in Marin County granted the Department's section 388 petitions, reinstated the Marin County dependency proceedings, dismissed the petitions that had been filed in Contra Costa County, and terminated Aunt's guardianship. The court denied a request by Mother for reunification services. The court set a section 366.26 hearing for October 27, 2014, to select a new permanent plan for the children. The section 366.26 hearing was later continued to January 5, 2015.

### 2. Placement Changes

In September 2014, five-year-old Younger Brother was removed from the godparents' home in Sacramento for safety reasons, after he engaged in aggressive behavior in the home and at school. Younger Brother bit another child in the godparents' home on several occasions. He also choked himself, put glass in his mouth, stomped on the small family dog, and punched Older Brother, then 10 years old, in the stomach hard enough to cause him to vomit. At school, Younger Brother punched his teacher, hit other students and threw a book at a classmate's face.

Upon his removal from the godparents' home, Younger Brother was placed in a foster home in Marin County. The children's CASA believed Younger Brother should instead be placed in a therapeutic foster home. In October and December 2014, the Department reported it was searching for an intensive treatment foster care home for Younger Brother, preferably located near his siblings. As of December 2014, he was being assessed for an individualized education plan (IEP) at school. He was diagnosed with post-traumatic stress disorder.

In November 2014, it came to the attention of the godparents and the Department that Older Brother had engaged in inappropriate sexual behavior with other children in

the home. He was removed from the godparents' home and placed in an intensive therapeutic foster care home in Sacramento County. He was participating in individual therapy and receiving therapeutic behavioral services.

Sister remained in the godparents' home.

### 3.    Visitation

In late 2014, the court suspended visitation between the children and Mother, Aunt and Grandmother pending a determination by the children's therapists that visitation would be appropriate. In its report for a December 8, 2014 review hearing, the Department recommended that visitation remain suspended. The Department stated that earlier visits with Aunt and Grandmother had been emotionally taxing for the children. Older Brother and Sister stated Aunt did things in the visits "to 'make them feel bad.' " The Department stated Grandmother "has been unable to protect the children from their aunt, and recently left them with their aunt when she was supposed to be monitoring the visit." While Mother had not caused the children direct harm during her visits, she had been inconsistent in visiting with them. The children had been frustrated during a recent visit at a family party when Mother spent more time with other adults than with the children. Finally, the Department recommended a temporary suspension of visits among the siblings, in light of Older Brother's sexualized conduct.

At the December 8, 2014 hearing, the court left in place the order suspending visitation pending further input from the children's therapists. The court also suspended visitation among the siblings.

### 4.    The Section 366.26 Hearing in January 2015

In its report for the section 366.26 hearing set for January 5, 2015, the Department recommended adoption as the permanent plan for all three of the children. The Department did not request termination of parental rights, but instead asked for a 180-day continuance of the hearing to allow time to find appropriate adoptive homes for Older Brother and Younger Brother. Sister remained in the home of her godparents, who wanted to adopt her. But the Department asked for a 180-day continuance as to Sister as

7

well, to allow the household to adjust to the recent changes in the composition of the household and the new routine.

At the hearing, the court found there was clear and convincing evidence that each of the children would be adopted. The court selected adoption as the permanent placement goal and ordered that efforts be made to find appropriate adoptive families. (See § 366.26, subd. (c)(3).) The court set a hearing for June 29, 2015 for the Department to report on its efforts to locate adoptive families for the children.

### 5. Mother's Section 388 Petitions

On May 8, 2015, the Department filed notices of the continued section 366.26 hearing. In the notices, the Department stated it recommended (1) termination of parental rights and selection of adoption as the permanent plan for Sister and Younger Brother, and (2) establishment of a legal guardianship for Older Brother.

On May 20, 2015, Mother filed section 388 petitions asking the court to change the children's placements and place them with Grandmother. Specifically, the petitions requested that the court modify its January 5, 2015 order confirming that the children's placements were necessary and appropriate and ordering the matter continued for the purpose of seeking adoptive homes for the children. The petitions stated Grandmother had acquired a home that was large enough to house all three children. The court set a hearing on the petitions for June 8, 2015.

The children's CASA filed a memorandum opposing the section 388 petition and stating that all three children were doing well in their placements. At the June 8, 2015 hearing, the Department's counsel and the attorneys for the children also stated they opposed Mother's request. After hearing argument and after questioning Mother's counsel about the proposed change of placement, the court concluded that the petition did not present sufficient information to warrant holding an evidentiary hearing, and that the requested change was not in the best interests of the children.

Mother appealed the court's order denying her section 388 petitions (No. A145648).

8

**6. The Termination of Parental Rights as to Sister and Younger Brother**

In a June 2015 report for the section 366.26 hearing, the Department recommended that the court terminate Mother's parental rights as to Sister and Younger Brother and select adoption as their permanent plan. The Department recommended that the court order a planned permanent living arrangement for Older Brother, who was doing well in his therapeutic foster placement.

The Department reported that Sister remained in the home of her godparents, who wanted to move forward with adopting her. Younger Brother, who had been living in a therapeutic foster home since January 2015, was in the process of transitioning to an adoptive home in Solano County. While Younger Brother continued to have challenging behavioral issues, he had made significant progress in his most recent foster placement. The prospective adoptive parents had spent a significant amount of time getting to know Younger Brother since early April 2015 and were committed to moving forward with adopting him. Younger Brother was to move into the home on June 13, 2015.

In a supplemental report filed in July 2015, the Department reported that Younger Brother had moved into his prospective adoptive placement and was doing well there. The Department believed that, if this family could not adopt Younger Brother for any reason, the Department would be able to find another adoptive home for Younger Brother. The Department concluded both Younger Brother and Sister were adoptable. While acknowledging that placement of the children in three separate homes "does interrupt the sibling relationship," the Department stated that, due to the children's unique needs, placing them in three separate homes had been necessary and was in each child's best interest. The Department also stated the caregivers for all three children favored maintaining the sibling relationships and had facilitated visits among the children. The Department concluded that, for Sister and Younger Brother, the benefit of adoption outweighed the benefit of maintaining the sibling relationships by placing the children in less permanent placements.

At the section 366.26 hearing on July 23, 2015, the court admitted into evidence the Department's and the CASA's reports for the hearing, and the social worker and

9

Mother testified. The court ordered a planned permanent living arrangement for Older Brother, and ordered that he remain a dependent of the court. As to Sister and Younger Brother, the attorneys for the children and their CASA supported the Department's recommendation that the court select adoption as the permanent plan. After hearing argument, the court found clear and convincing evidence Sister and Younger Brother were likely to be adopted. The court terminated Mother's parental rights as to Sister and Younger Brother and selected adoption as their permanent plan.

Mother appealed the orders terminating her parental rights as to Sister and Younger Brother (No. A145970). We granted Mother's motion to consolidate her two appeals.

## II. DISCUSSION

### A. The Denial of the Section 388 Petition

#### 1. Legal Standards

Under section 388, a parent may petition to modify a prior order "upon grounds of change of circumstance or new evidence." (§ 388, subd. (a)(1); see Cal. Rules of Court, rule 5.570(a).) The juvenile court shall order a hearing where "it appears that the best interests of the child . . . may be promoted" by the new order. (§ 388, subd. (d).) "Thus, the parent must sufficiently allege *both* a change in circumstances or new evidence *and* the promotion of the child's best interests." (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1157.)

"A prima facie case is made if the allegations demonstrate that these two elements are supported by probable cause. [Citations.] It is not made, however, if the allegations would fail to sustain a favorable decision even if they were found to be true at a hearing. [Citations.] While the petition must be liberally construed in favor of its sufficiency [citations], the allegations must nonetheless describe specifically how the petition will advance the child's best interests." (*In re G.B., supra,* 227 Cal.App.4th at p. 1157.) In determining whether the petition makes the required showing, the court may consider the entire factual and procedural history of the case. (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 258.)

After the termination of reunification services (which in this case occurred in October 2011), the goal of family reunification is no longer paramount, and " 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)

We review a juvenile court's decision to deny a section 388 petition without an evidentiary hearing for abuse of discretion. (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)

## 2. Analysis

Mother's section 388 petitions, which were unsupported by any declarations or other evidence, did not state a prima facie case that required the juvenile court to hold an evidentiary hearing. Mother alleged that Grandmother had acquired a home large enough to house all three children. Assuming this development constituted a change in circumstances for purposes of section 388, Mother did not make a prima facie showing the proposed modification—removing the children from their placements and placing them with Grandmother—would be in the children's best interests. (See *Stephanie M., supra,* 7 Cal.4th at p. 317 [section 388 petitioner seeking to change a child's placement must show a change of circumstances or new evidence and that a change in placement is in the child's best interests].) The petitions contained only conclusory allegations on this point. Significantly, Mother did not allege that any of the children's current or prospective placements was inadequate. Instead, Mother alleged placing the children with Grandmother would be in their best interests because the children are "comfortable with" Grandmother, who "can provide stability and a permanent placement for the children. All three children would be able to live together and grow up together, a necessity they are deprived of in their current living situation, in three separate homes." In light of the history of the dependency proceeding, the court did not err in concluding

11

that these broad assertions did not constitute a prima facie showing that the proposed placement changes would be in the best interests of the children.

First, Mother's assertion that placing the three children together would be in their best interests did not require the juvenile court to hold an evidentiary hearing. In its report for the section 366.26 hearing in January 2015, the Department explained that, although the children had been placed together during most of the period since their removal from Mother's custody, "safety concerns and the behaviors the children are exhibiting have made this impossible at this time." Specifically, the Department noted that Older Brother had been sexually inappropriate with Sister and with other children in the godparents' home, "requiring him to be placed in a home with no other children." He was removed from the godparents' home in November 2014 and placed in an intensive therapeutic foster care home. Younger Brother was removed from the godparents' home in September 2014 and placed in a separate foster home after he "exhibit[ed] aggressive behaviors at home and at school that require a significant amount of attention from any caregiver to meet his current needs."

The record thus established that both boys needed a significant amount of individualized attention and support. Sister remained in the godparents' home. She was doing well there, and the godparents wanted to adopt her. In light of the specific and differing needs of the three children as established by the history of the dependency case, Mother's categorical assertion in her section 388 petition that the children would be better off if they were moved to a single home did not constitute a prima facie showing that the proposed move would be in the children's best interests and did not require the juvenile court to hold an evidentiary hearing.

Second, in light of the children's specialized needs as illustrated by the history of the dependency case, Mother's general statements that the children are comfortable with Grandmother and that Grandmother can provide them with stability did not require the court to hold an evidentiary hearing. Mother's petition did not articulate any basis for concluding Grandmother would be better equipped than the children's caregivers to address their needs. Indeed, as the record of the dependency case showed, and as the

12

juvenile court noted in denying Mother's petitions, Grandmother lived with Aunt during part of the period when Aunt emotionally and physically abused the children, and Grandmother apparently was unable to protect the children. After the children were removed from Aunt's home, Aunt reportedly made the children feel bad during visits by questioning their loyalty to their family. Grandmother was responsible for monitoring visits between the children and Aunt, but on one occasion Grandmother had a conflict with Aunt and left the children "in the care of [Aunt] unsupervised." For these reasons, visits were temporarily suspended in late 2014.[2]

Finally, as to each of the three children, Mother did not allege facts that would rebut the presumption that continued foster care was in their best interests at this advanced stage of the dependency proceedings. All three children reportedly were doing well in their placements. Sister had lived with her godparents since early 2014 and was doing well there. The godparents wanted to adopt her. Mother alleged no facts in her section 388 petition that would rebut the presumption that it would be in Sister's best interest to remain in her suitable and stable placement with her godparents. Indeed, Mother acknowledges on appeal that changing Sister's placement "may not have had obvious utility" in light of her stable placement.

As Mother notes, Older Brother and Younger Brother have experienced more placement changes than Sister, and they were not in adoptive placements when Mother filed her section 388 petitions. But Mother's petitions did not present a prima facie

---

[2] In her appellate brief, Mother notes Grandmother had supervised visits with Sister (in late March 2015) and with Older Brother (in early April 2015). These visits went well, and both Sister and Older Brother were excited to see Grandmother. But even if Mother had alleged these facts in her petitions, the court's decision not to hold an evidentiary hearing would not have been an abuse of discretion. In light of the history of the dependency case (including Grandmother's presence during the children's placement with Aunt, and the children's unique needs), the fact the children enjoyed recent supervised visits with Grandmother did not constitute a prima facie showing that removing the children from their placements and placing them with Grandmother would be in their best interests.

showing that removing Older Brother and Younger Brother from their placements and placing them with Grandmother would be in their best interests.

Older Brother had been removed from the godparents' home in November 2014 due to his sexualized conduct, and had been placed in an intensive therapeutic foster home with no other children. He was reportedly doing well there, and the foster family was addressing his specialized needs. The children's CASA volunteer reported that Older Brother's foster family had been "able to provide a caring and supportive environment for [Older Brother], while at the same time providing structure and well defined limits." Nothing in Mother's petitions suggested that Grandmother would be better able to provide the structure and support that were necessary in light of Older Brother's unique needs, or that it would be in Older Brother's best interest to be removed from his foster family.[3]

Younger Brother was removed from the godparents' home in September 2014 due to his aggressive behavior and was placed in a foster home in Marin County. The children's CASA volunteer raised concerns about that foster home, and the Department sought to place Younger Brother in an intensive therapeutic foster home. In January 2015, Younger Brother was removed from his foster placement and placed in an emergency foster home, also in Marin County. According to the children's CASA volunteer, there was a "significant turnaround in [Younger Brother's] behavior" after he was placed in the emergency foster home. The foster parents in the emergency foster home "provided [Younger Brother] with a caring but structured environment, where [Younger Brother] appears to feel safe." In February 2015, a prospective adoptive home was located for Younger Brother. The Department, in conjunction with Younger

---

[3] It is not clear whether such a move would have been possible in any event. According to a memorandum filed by the children's CASA and a subsequent report filed by the Department, Older Brother's sexualized conduct resulted in juvenile delinquency proceedings in Sacramento County. On May 21, 2015 (the day after Mother filed her section 388 petitions in the Marin County dependency proceedings, and prior to the June 8, 2015 oral arguments on the petitions), the Sacramento juvenile court ordered that Older Brother remain in his current foster placement with no other children.

14

Brother's service providers, decided that a slow, planned transition to the new home was in Younger Brother's best interest. Beginning in April 2015, Younger Brother had several visits with the potential new parents and siblings, including overnight stays. These transitional visits went well. Younger Brother's move into his new placement was to be made after Younger Brother finished the school year (kindergarten), and was scheduled for June 13, 2015. Mother's petition alleged no facts that would support a conclusion that Grandmother would be better able to address Younger Brother's unique needs than the foster parents in his emergency foster placement, or that it would be in Younger Brother's best interest to be removed from that placement. Nor did the petition allege facts supporting a conclusion that it would be in Younger Brother's best interest to disrupt the transition to his prospective adoptive home, a transition that already was underway when Mother filed her petition in late May 2015.

In a memorandum of points and authorities submitted with her section 388 petition, Mother argued the relative placement preference in section 361.3 supported her placement request. In her opening appellate brief, Mother refers briefly to that memorandum, and suggests the juvenile court should have considered the "possible application" of section 361.3 in the selection of Younger Brother's new placement (i.e., the prospective adoptive home to which he was transitioning when Mother filed her petition).

We reject this argument. Section 361.3 did not apply to the selection of Younger Brother's adoptive placement. Section 361.3 establishes a relative preference that applies in selecting a temporary placement when a child is removed from parental custody, or thereafter when a new placement of the child is necessary.[4] (§ 361.3, subds. (a), (d); *In re*

---

[4] When it applies, section 361.3 requires social workers and juvenile courts to give "preferential consideration" to a request by a relative for placement of a dependent child with the relative. (§ 361.3, subds. (a), (d).) " 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1); accord, *In re Sarah S.* (1996) 43 Cal.App.4th 274, 286.) The relative placement preference established by section 361.3 does not constitute "a relative placement *guarantee*." (*In re Joseph T.* (2008) 163 Cal.App.4th 787, 798.) Section

15

*Lauren R.* (2007) 148 Cal.App.4th 841, 854, 857; *In re Sarah S., supra,* 43 Cal.App.4th at p. 284.)  The section 361.3 relative placement preference does not apply where, as here, the social services agency is seeking an adoptive placement for a dependent child for whom the court has selected adoption as the permanent placement goal.  (*In re Lauren R., supra,* 148 Cal.App.4th at pp. 854–855.)  At the section 366.26 hearing in January 2015, the court selected adoption as Younger Brother's permanent placement goal pursuant to section 366.26, subdivision (c)(3), and ordered the Department to attempt to find an appropriate adoptive family for him.  The Department located an adoptive home for Younger Brother in February 2015; he began visits with the prospective adoptive parents in April 2015; and he was scheduled to move into the home on June 13, 2015.  That process did not trigger the relative placement preference in section 361.3, because Younger Brother's prospective adoptive placement "did not constitute a necessary new placement within the meaning of the relative placement preference.  There is no relative placement preference for adoption." (*In re Lauren R., supra,* 148 Cal.App.4th at pp. 854–855.)

In concluding that an evidentiary hearing on Mother's petitions was not warranted, the juvenile court noted that "for once these children are each receiving individualized attention that they have desperately needed for a long, long time."  The court further stated:  "I can appreciate the importance and the preference for placing children together; but that is by no means absolute and it has to be weighed against their individual best interests, which is how I am looking at it here."  The record of the dependency proceeding, as outlined above, supports the court's conclusion that the children's separate placements were in their best interests in the circumstances of this case.  In light of that record, the general assertions in Mother's petitions that the children would be better off if they were removed from their placements and placed together with Grandmother did not

---

361.3 identifies factors the court and social worker must consider in determining whether the child should be placed with a relative.  (§ 361.3, subd. (a)(1)–(8).)

constitute a prima facie showing that required the juvenile court to hold an evidentiary hearing on the petitions.

**B.     The Order Terminating Parental Rights as to Sister and Younger Brother**

Where reunification services have failed and a hearing pursuant to section 366.26 is held, the court must determine whether the child is likely to be adopted; if so, with limited exceptions, the court must terminate parental rights and order the child placed for adoption.  (§ 366.26, subd. (c)(1).)  Mother contends there was not sufficient evidence supporting the juvenile court's finding that Younger Brother is likely to be adopted.  She also argues, as to both Sister and Younger Brother, that the court erred in not applying the sibling relationship exception to termination of parental rights set forth in section 366.26, subdivision (c)(1)(B)(v).  We reject both claims of error.

**1.     Adoptability**

As noted, "[o]nce reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability."  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  To select adoption as a child's permanency plan at a section 366.26 hearing, the juvenile court must find by clear and convincing evidence that it is likely the child will be adopted within a reasonable time.  (§ 366.26, subd. (c)(1); *In re Zeth S.* (2003) 31 Cal.4th 396, 406.)  The fact the child is not yet placed with a family prepared to adopt the child "shall not constitute a basis for the court to conclude that it is not likely the child will be adopted."  (§ 366.26, subd. (c)(1); accord, *In re B.D.* (2008) 159 Cal.App.4th 1218, 1231.)  The adoptability inquiry "focuses on the *minor,* e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor.  [Citations.]  Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' "  (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 (*Sarah M.*).)  "Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor.  In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor

17

is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*." (*Id.* at pp. 1649–1650.)

When the juvenile court's adoptability finding is challenged on appeal, we determine whether the record contains substantial evidence from which the court could find clear and convincing evidence that the child was likely to be adopted within a reasonable time. (*In re B.D., supra,* 159 Cal.App.4th at p. 1232.) We draw all reasonable inferences supporting the juvenile court's adoptability finding and resolve any evidentiary conflicts in favor of the court's order. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).)

Substantial evidence supports the juvenile court's finding that Younger Brother was likely to be adopted. In its supplemental report for the July 23, 2015 permanency hearing, the Department stated that Younger Brother "is an extremely bright, inquisitive, and likeable six year old little boy," but acknowledged that he had exhibited aggressive and challenging behavior. Similarly, the children's CASA volunteer stated Younger Brother "is a sweet, bright boy, but shows the effects of the neglect and abuse he experienced"; the CASA volunteer noted Younger Brother had engaged in violent and disruptive behavior. On appeal, Mother argues Younger Brother's behavior undercuts a conclusion he is adoptable. We conclude that, in light of evidence that Younger Brother's behavior had improved and that his prospective adoptive parents wanted to adopt him, substantial evidence supports the juvenile court's finding Younger Brother is adoptable.

As Mother notes in her appellate brief (and as we outline above), when Younger Brother was placed with his godparents in 2014, he engaged in aggressive behavior at home and at school, including biting and hitting other children, punching his teacher, and stomping on the family dog. In September 2014, he was removed from the godparents' home and placed in a foster home in Marin County. While in that placement, Younger Brother continued to display troublesome behaviors.

But there was evidence that, after Younger Brother was moved to an emergency foster home in January 2015, his behavior improved significantly. The children's CASA

volunteer reported there was "a significant turnaround in [Younger Brother's] behavior since he was placed in the emergency foster home." The foster parents in that home provided Younger Brother with a caring and structured environment, and were "able to provide him one on one attention[.]" In that environment, and with the assistance of counseling, Younger Brother "responded by making very significant progress in his behavioral issues." While he continued to "experience issues with angry outbursts, particularly when frustrated, these outbursts are far fewer and shorter in duration than in the past." The Department similarly reported in its July 2015 addendum report that, "[a]lthough [Younger Brother] has presented with many challenging behaviors, he has demonstrated a lot of growth and has made strides in decreasing his aggressive behavior over the past five months. In addition to behavioral changes in the home, [Younger Brother] has begun integrating himself into the general classroom and [has] made improvements in his peer relations." This evidence that Younger Brother was responsive to appropriate care and attention and that his behavior was improving supports the juvenile court's conclusion he was adoptable.

In addition, as noted, Younger Brother was placed with prospective adoptive parents who were committed to adopting him. While such a placement is not a prerequisite to a finding of adoptability (*Sarah M., supra,* 22 Cal.App.4th at p. 1649), the prospective adoptive parents' interest in adopting Younger Brother is evidence that his age, physical condition, mental state, and other characteristics are not likely to dissuade individuals from adopting him, and that he is likely to be adopted within a reasonable time either by the prospective adoptive parents or by another family (*id.* at pp. 1649–1650). Consistent with this conclusion, the social worker stated she believed that, if Younger Brother's current caregivers could not adopt him for any reason, the Department would be able to find another adoptive home for him, in light of the improvement in his behavior.

On appeal, Mother contends there was not sufficient evidence that the prospective adoptive parents had the ability or training to meet Younger Brother's emotional needs and handle his behavioral issues. We note there was evidence the prospective adoptive

19

parents were equipped to address Younger Brother's needs. The Department reported the prospective adoptive parents have previously adopted other children, one of whom had "equally, if not more challenging behaviors than [Younger Brother]." The new caregivers are "highly skilled and trained to deal with children with very difficult behaviors." The CASA report similarly noted the prospective adoptive parents "are experienced in dealing with the types of issues that [Younger Brother] has exhibited, and have the potential to provide the type of consistent and structured environment, and loving care, that [Younger Brother] needs at present." In any event, as noted, the focus of the adoptability inquiry is on the child and whether his characteristics will make him difficult to adopt, rather than on the suitability of the prospective adoptive home. (*Sarah M., supra,* 22 Cal.App.4th at pp. 1649–1650.) The prospective adoptive parents' interest in adopting Younger Brother supports a conclusion he was likely to be adopted within a reasonable time, either by the prospective adoptive parents or by another family.

### 2. The Sibling Relationship Exception

Under section 366.26, subdivision (c)(1), the denial of reunification services "shall constitute a sufficient basis for termination of parental rights" unless "(B) [t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] . . . [¶] (v) There would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption."

This provision creates a "heavy burden" for the party opposing adoption. (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) To establish the applicability of the sibling relationship exception, a parent must first show that termination of parental rights would "substantially interfere" with the sibling relationship. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951.) This requires proof of a "significant sibling relationship, the

20

severance of which would be detrimental to the child." (*Id.* at p. 952.) If such a strong sibling relationship exists, the court then "weighs the benefit to the child of continuing the sibling relationship against the benefit to the child adoption would provide." (*Id.* at pp. 952–953.) "The court must balance the beneficial interest of the child in maintaining the sibling relationship, which might leave the child in a tenuous guardianship or foster home placement, against the sense of security and belonging adoption and a new home would confer." (*Id.* at p. 951.) In making these determinations, the court may consider only the possible benefits and detriments to the child being considered for adoption, not the child's siblings. (*In re Celine R.* (2003) 31 Cal.4th 45, 54.) The sibling relationship exception, like the other exceptions in section 366.26, subdivision (c)(1), must be considered in light of the legislative preference for adoption, which remains the "norm." (*In re Celine R., supra,* 31 Cal.4th at p. 53.)

In reviewing determinations on the applicability of the sibling relationship exception and other exceptions to adoption, some appellate courts have applied the substantial evidence standard of review (*In re L.Y.L., supra,* 101 Cal.App.4th at p. 947), while other courts have concluded the abuse of discretion standard is appropriate (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351), and some have applied a combination of the two standards (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315). On the record before us, we would affirm under either standard. (See *In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351 [practical differences between standards are not significant].)

The Department acknowledged in its reports that the children have significant relationships with each other. But the reports also explained that the children's behavior and specific needs made it impossible to keep them in the same placement. Due to his sexualized conduct and juvenile delinquency proceedings, it was not possible to place Older Brother with either of his siblings. And it would be detrimental to remove Sister from her godparents' home to place her with Younger Brother (who had been removed from the godparents' home due to his aggressive behavior). The Department concluded placement of the children in three separate homes was necessary and in each child's best interest. The Department reported, however, that the children's current caregivers had

21

facilitated contact and visitation among the children, and were in favor of maintaining the sibling relationships.

In this context, the Department concluded, and the juvenile court reasonably could conclude, that the permanency and stability that adoption would confer on Sister and Younger Brother outweighed the disruption of their sibling relationships that could occur. Noting that Sister and Younger Brother "have experienced a lot of unpredictability, loss, and disruption over their young lives," the Department concluded they "are in need of a stable, loving, and predictable home environment with caregivers who can meet their individualized needs." Both children were placed in prospective adoptive homes that the Department believed would meet their needs. Sister had been living with her godparents for over one year and was thriving in their home. The Department stated that Sister referred to her caregivers as her parents, and referred to the other children in the home as her siblings. She had expressed a desire to be adopted. Younger Brother had recently transitioned to his prospective adoptive placement and was doing well there. He appeared to be happy and comfortable in his new placement, showed affection for his caregivers, and enjoyed interacting with the two older children in the home.

The Department concluded Sister and Younger Brother "deserve the safety and stability of a permanent home through the plan of adoption." The court similarly concluded that termination of parental rights was in Sister's and Younger Brother's best interests, and that adoption was the appropriate permanent plan for them. In light of the record before it, the court reasonably could conclude that the alternative—declining to terminate parental rights and leaving Sister and Younger Brother in less secure guardianship or foster home placements—was not in their best interests. (See *In re L.Y.L., supra,* 101 Cal.App.4th at p. 951.)

### III. DISPOSITION

The order denying Mother's section 388 petition is affirmed. The order terminating Mother's parental rights as to Sister and Younger Brother is affirmed.

22

_____
Streeter, J.

We concur:


_____
Ruvolo, P.J.


_____
Reardon, J.


A145648, A145970/*In re K.L.*

23

Filed 6/13/16

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re K.L. et al., Persons Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH AND HUMAN SERVICES DEPARTMENT, Plaintiff and Respondent, v. D.J., Defendant and Appellant. | A145648 (Marin County Super. Ct. No. JV 25305A, JV 25306A, JV 25307A) |
| In re K.L. et al., Persons Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH AND HUMAN SERVICES DEPARTMENT, Plaintiff and Respondent, v. D.J., Defendant and Appellant. | A145970 (Marin County Super. Ct. No. JV 25306A, JV 25307A) ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |

THE COURT:

The opinion in the above-entitled matter filed on May 25, 2016, was not certified for publication in the Official Reports. For good cause, the request for partial publication is granted.

1

Pursuant to California Rules of Court, rules 8.1105, 8.1110 and 8.1120, the opinion in the above-entitled matter is ordered certified for publication in the Official Reports with the exception of part II.B of the opinion.

Dated: _____          _____
                                   Ruvolo, P.J.

*In re K.L et al.* (A145648, A145970)


Trial court:                              Marin County Superior Court


Trial judge:                             Hon. Faye D'Opal; Hon. Beverly K. Wood


Counsel:


Jamie A. Moran, by appointment of the Court of Appeal under the First District Appellate Project independent case system, for Defendant and Appellant.

Steven M. Woodside, County Counsel, Mari-Ann G. Rivers, Deputy County Counsel, for Plaintiff and Respondent.