Filed 11/12/24  In re L.B. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re L.B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  M.A.,  Defendant and Appellant. | E083922  (Super.Ct.Nos. J294865 & J294866 & J294867)  OPINION |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, Landon Villavaso, Deputy County Counsel for Plaintiff and Respondent.

1

Defendant and appellant M.A. (Father) challenges the juvenile court's denial of his modification petition under Welfare and Institutions Code section 388[1], by which he sought reunification services the court previously denied with his three children, ages five and under. The children had spent all or most of their lives in successive court dependencies, out of Father's custody, including the present one during which Father was incarcerated. He premised his petition on, among other factors, his pending request in federal court seeking early release on the eve of the children's permanent plan selection and implementation hearing (hereafter .26 hearing; see § 366.26). The record shows he was in fact released and had a visit with the children before the juvenile court denied his modification petition. He contends the court erred in concluding he did not meet his prima facie burden in his petition to show both changed circumstances warranting the modification he requested and that it would be in the children's best interests. As we explain, the court did not err. We therefore affirm the order denying Father's petition.

**FACTUAL AND PROCEDURAL HISTORY**

Father and L.B. (Mother) have two daughters together: S.B., born in 2017, and L.B., born in 2021; they also have a son, E.B., born in 2019 (collectively, the children). Before L.B. was born, when their son was less than a year old and S.B. was two, the children were removed from Father and Mother's custody and made juvenile court dependents in proceedings spanning from May 2020 to June 2022.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

Father had been arrested before this initial dependency for transporting sixty kilograms of cocaine from Mexico to the United States. It appears Father obtained pretrial release for some portion of the dependency, during which he completed his case plan services. However, following sentencing in February 2022, he began serving—in March 2022—the remainder of an eight-year federal prison sentence. Mother completed the last several months of the dependency under a plan of family maintenance; she met the children's needs sufficiently for the case to close in June. Father's expected release date was more than five years away, in October 2027.

Six weeks after the dependency was terminated, in July 2022, San Bernardino County Children and Family Services (CFS) received a report that Mother was again using methamphetamine and marijuana, including in the children's presence. She appeared to be under the influence at a birthday party for S.B. CFS attempted, to no avail, to contact Mother at the motel room where she was residing. The room was reported to be filled with trash, old food, and dirty dishes, and the children were unkempt, in soiled diapers.

A second, similar referral in August 2022 reiterated Mother's alleged methamphetamine use and added that the baby, L.B., was covered with tick and mosquito bites. Further, L.B. had active bleeding from her groin area due to scratching. The children had rashes, were unbathed, wore soiled clothes, lacked energy, and looked visibly unhealthy.

When CFS investigated, Mother denied using methamphetamine or marijuana at the birthday party or otherwise but then admitted drug testing would show recent

marijuana use. The responding social worker found the motel apartment filthy, with food left out and "an abundance of" cockroaches on the walls, the ceiling, and the kitchen floor. Mother reported she was in the process of being evicted. The children were in soiled clothes, unbathed, had not been to a doctor in "a while," and the oldest was not yet enrolled in school. Mother felt overwhelmed and depressed at being left by Father to care for the three children alone.

The children's paternal grandfather (PGF) provided Mother with some financial support, but could not continue to do so. Experienced in addiction and recovery himself, he reported that Mother was "definitely" using drugs and that the children were not safe in her care. PGF said his son remained in federal custody serving a seven-year term. CFS detained the children, and the juvenile court at the detention hearing upheld their ongoing removal from parental custody.

The court eventually sustained allegations of parental neglect requiring dependency jurisdiction (§ 300, subd. (b)), including that Father knew or should have known of Mother's untreated substance abuse issues but failed to protect the children from the risks posed in her care. The court also found dependency protection necessary because the older children had been exposed to Father's history of domestic violence. The court ordered reunification services for Mother, but denied them for Father. The court found given the circumstances of Father's incarceration that reunification services would be detrimental to the children. Father did not appeal the court's jurisdiction or disposition findings.

4

The court at the ensuing six-month review hearing found Mother made only "minimal" progress on her case plan, insufficient to justify continuing reunification services. Consequently, the court terminated reunification efforts and scheduled a .26 hearing.

Two weeks before the hearing, Father filed his modification petition. He based his request for the juvenile court to grant him reunification services on alleged changes in circumstances, including: (1) he had filed a request that was pending with the federal court for his "compassionate release" because Mother could no longer care for the children; (2) he had taken certain courses in prison to prepare for reintegration into society, although his parenting class and drug rehabilitation class were still "pending"; (3) he would work at his father's construction business if released; (4) he suggested he and the children would be able to reside with PGF, though in a separate letter PGF clarified he would try to help Father obtain an apartment; and (5) PGF would provide "family support" for reunification, in particular for housing. The juvenile court set a hearing to consider Father's petition.

The hearing was continued and, in the interim, a CFS status report reflected that Father had been released from federal custody and visited the children. The monitor's notes for the visit indicated: "no emotion expressed on [Father] not seeing the children in about two years and vi[c]e versa." The children were ready for the visit to conclude before it ended, asking when it would be over.

The children's caregiver, who had fostered the older two during the previous dependency and developed a bond with all three over the course of the present one,

reported that the children appeared neither scared nor excited to see Father when she dropped them off for the visit. They did not run to him or hug him. S.B. asked Father, "[W]hy do you have tattoos," in reference to new tattoos on Father's head. After the visit, the children did not want to go to sleep that night, staying up until 10 p.m., and the next day E.B. was uncharacteristically withdrawn at school, so the caregiver picked him up early. The caregiver told the social worker that Father's bi-weekly calls with the children, while he was in prison, lasted about two minutes, then the children lost interest and disengaged.

Interviewed by the social worker, the two older children indicated they referred to the caregiver, prospective adoptive parents as their mom and dad. The social worker believed they were bonded to the caregivers, who were open to adoption or guardianship, depending on the children's best interests. E.B. called his biological parents his "other mom and dad," while S.B. referred to her mother by her first name. The children reported that they loved "both of their moms and dads," but expressed a preference to remain placed "with 'this mom and dad.'"

PGF confirmed his offer of employment for his son and that he would assist him in finding housing. He also reiterated the children could not live with him as Father had suggested in his petition. PGF explained that he lacked space and taking them into his care would be "doing them a 'disservice'" when they had stable housing with the caregivers.

At the hearing on his petition, Father emphasized his "constant contact" with the children, even while in prison, as indicating their best interests called for reopening

6

reunification services for him. He cited his initiative in gaining his release from prison on behalf of the children; he also indicated he was looking into "finding drug treatment" and therapy to "maintain a positive relationship with the children and sobriety." Father suggested that the children "call[ing] him Father" showed he "maintained a relationship" with them that served their best interests; he stressed the children knew of his efforts "trying to get custody of them back."

Minors' counsel opposed the petition. Minors' counsel argued Father's release did not itself demonstrate changed circumstances for the children's benefit. Deputy county counsel concurred on behalf of CFS. Counsel acknowledged that "while in one way, Father's circumstances have changed in that he is no longer in custody, [i]n another, they are still only changing." For example, "there is silence with regard to how the request would benefit the children beyond 'this is their father and it is in their best [interest] to have a . . . relationship with him.' " Observing that Father "was still in custody at the time the original .26 [hearing] was set," CFS's counsel argued Father's modification request to reopen the reunification period lacked merit and only "further delay[ed] permanency" for the children.

The juvenile court denied Father's petition. The court's oral ruling reflected deep familiarity with the children's dependency history; the court reviewed the proceedings dating back to their original removal in May 2020 in the first dependency. The court noted as to Father's petition that during the most recent 24 months he spent apart from the children in federal custody, he "has taken courses in money management, resume writing, water color painting, and cognitive behavior." The court also reviewed the

nature of Father's relationship with the children as reflected in his postprison visit with them.

In denying the petition, the court concluded that "[t]he request *does* demonstrate *changing* circumstances in that [Father] was released from custody prior to his parole date of 2027." (Italics added.) The court continued: "However, there's been insufficient evidence presented as to the classes father has enrolled [in] and taken while he's [been] in custody [and on] whether or not he benefited from those classes to overcome the issues that led to the children's second removal from the home."

The juvenile court also found that Father's proposed modification "does not promote the best interest[s] of the children," noting in particular that "they have been in and out of [Father's custody] since the first case [and] now the second case." The court concluded an evidentiary hearing to further evaluate the merits of Father's petition was not necessary.

The court then proceeded to the .26 hearing, found that the children were adoptable, that a permanent plan of adoption with their foster parents best served their interests, and the court terminated Father's and Mother's parental rights. Only Father now appeals.

## DISCUSSION

Father argues the juvenile court erred in denying his modification petition. He contends that at a minimum he was entitled to an evidentiary hearing on the merits of his petition. He is incorrect.

8

"Section 388 allows an interested person to petition the juvenile court for a hearing to change, modify or set aside a previous order. . . . The burden of proof is on the petitioner." (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423.) "The parent seeking modification must 'make a prima facie showing to trigger the right to proceed by way of a full hearing. [Citation]' [Citations.] There are two parts to the prima facie showing: The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children." (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)

"'A prima facie case is made if the allegations demonstrate that these two elements are supported by probable cause. [Citations.] It is not made, however, if the allegations would fail to sustain a favorable decision even if they were found to be true at a hearing. . . . In determining whether the petition makes the required showing, the court may consider the entire factual and procedural history of the case." (*In re K.L.* (2016) 248 Cal.App.4th 52, 61-62.)

We review a juvenile court's denial of a modification petition without an evidentiary hearing under the abuse of discretion standard. (*In re Daniel F.* (2021) 64 Cal.App.5th 701, 711.)

"While the petition must be liberally construed in favor of its sufficiency [citation], the allegations must nonetheless describe *specifically* how the petition will advance the child's best interests." (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1157, italics added.) Father's petition did not do so. Implication or suggestion is not enough: "general, conclusory allegations" do not make a prima facie case. (*In re Edward H.*

9

(1996) 43 Cal.App.4th 584, 593.) It appears Father simply relied on his biological relation to the children, but any "presumption favoring natural parents by itself does not satisfy the best interests prong of section 388." (*In re Justice P.* (2004) 123 Cal.App.4th 181, 192.)

To the contrary, once the juvenile court "has . . . terminated reunification services and set the matter for a section 366.26 hearing, the focus of the case shifts from the parents' interest in the care, custody, and companionship of the child to the needs of the child for permanency and stability." (*In re N.F.* (2021) 68 Cal.App.5th 112, 121.) Thus, the best interest analysis has a special focus when a parent seeks a change of order "on the eve of the .26 hearing." (*In re J.C.* (2014) 226 Cal.App.4th 503, 526.) "[A] parent's petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*Id.* at p. 527.)

Father's petition did not address these requirements. Instead, it was clear the children would have to remain in foster care as Father exited prison, began employment with PGF, and sought housing. Father had not had a custodial role in his children's lives over the course of four years in two dependencies, and never for his youngest child nor for three young children at once. He made no mention of child care in his petition, and PGF specifically disavowed that he could help Father this way. " 'A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent . . . might be able to reunify at some future

10

point, does not promote stability for the child or the child's best interests.' " (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206.)

In particular in Father's case, "very young children . . . require a more timely resolution of a permanent plan because of their vulnerable stage of development." (*Daria D. v. Superior Court* (1998) 61 Cal.App.4th 606, 612.) " '[G]iven the unique developmental needs of infants and toddlers, moving to permanency more quickly is critical.' " (*Ibid.*) Father ran out of time. L.B. especially was long overdue for permanency. (See § 361.5, subd. (a)(1)(B) [reunification services generally limited to six months for children entering dependency under age three].) Father's petition never crossed the best interests prima facie threshold.

Similarly, Father's showing was inadequate on the first prong as well. " '[C]hanged circumstances' " requires addressing the reason or reasons for dependency. (*In re Edward H.*, *supra*, 43 Cal.App.4th at p. 592; see *id.* at p. 593 ["the treatment received by the father did not address sexual abuse," a primary reason for the children's dependency there].) The requisite "change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.)

Here, the children became court dependents a second time because Father failed to arrange for their care and safety when he was sentenced to prison, leaving Mother to parent them, which she could not do. Further, he exposed the older children to domestic violence when he had been in the home. Father's petition gave no indication how he would meet—by himself—a new primary caretaking responsibility that was greater than

11

when he entered prison; he was also silent on domestic violence. Having addressed neither basis for the children's dependency, his petition was fatally deficient.

Father contends the juvenile court's ruling nevertheless must be reversed because the court applied the wrong legal standard. He asserts the court required him to make his showing to proceed to an evidentiary hearing by a preponderance of the evidence, rather than the governing prima facie standard. The prima facie standard requires only a showing of probable cause that the changed circumstances and best interests prongs may be met. (*In re K.L.*, *supra*, 248 Cal.App.4th at p. 61.)

We are not persuaded the juvenile court erred as Father suggests. The court made reference to the preponderance of the evidence standard, which we construe to have been regarding what was necessary for Father to ultimately prevail on his modification petition. (See, e.g., Cal. Rules of Court, rule 5.570(h)(1)(D) [petitioner bears burden of proof by a preponderance of evidence].) The court recognized the question before it at the present hearing was "whether or not [to] grant an evidentiary hearing" on Father's petition. We presume the court knew and properly applied the governing law, including the prima facie standard. (Evid. Code, § 664; see *J.H. v. G.H.* (2021) 63 Cal.App.5th 633, 644 [trial court's "failure to 'discuss' a particular standard does not imply it applied an incorrect standard"].)

In any event, moreover, we agree with CFS that any error concerning the applicable standard was necessarily harmless. (*In re Celine R.* (2003) 31 Cal.4th 45, 60 [harmless error analysis applies in dependency appeals].)

12

Section 388, subdivision (d), provides that "*[i]f* it appears that the best interests of the child . . . may be promoted by the proposed change of order, . . . the court shall order that a hearing be held." (Italics added.) "The conditional language of [section] 388 makes clear that the [evidentiary] hearing is only to be held if it appears that the best interests of the child may be promoted by the proposed change of order, which necessarily contemplates that a court need not order a hearing if this element is absent from the showing made by the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 807, fn. omitted.) The requisite showing was entirely absent. As discussed, Father's petition offered nothing beyond the bare assertion that the children's best interests lay in delaying permanency for him to begin reunification services at the 11th hour. Nor did he address the safe, daily caretaking and domestic violence concerns resulting in dependency again.

## DISPOSITION

The juvenile court's order denying Father's section 388 petition is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER_____
                    Acting P. J.

We concur:

CODRINGTON_____
                    J.

FIELDS_____
                    J.

13