Filed 1/21/22 In re M.P. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.P. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>V.C.,<br><br>    Defendant and Appellant. | G060346<br><br>(Super. Ct. Nos. 18DP0885, 18DP0886)<br><br>O P I N I O N |

Appeal from postjudgment orders of the Superior Court of Orange County, Mary Kreber Varipapa, Judge. Affirmed in part and reversed in part.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Debbie Torrez, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minors.

\*        \*        \*

In this juvenile dependency proceeding, V.C. (father) appeals from the denial of a Welfare and Institutions Code section 388 petition, in which he sought reinstatement of reunification services as to his two daughters.[1] He also appeals from a subsequent order terminating his parental rights as to one of his daughters, D.P.

The court denied the section 388 petition at the prima facie stage without holding an evidentiary hearing, which father contends was error. Reunification services were originally terminated due to father's continuing struggle with alcohol abuse, as well as his inability to secure stable housing. When he filed his section 388 petition, his on-again-off-again struggle with alcohol was unchanged. However, he had moved in with a girlfriend who was willing to house the children and thus, arguably, had secured stable housing. We conclude father failed to make a prima facie showing that reinstating reunification services was in D.P.'s best interests, when as an infant, D.P. had been placed in a stable home with loving caregivers who were willing to adopt her. However, his showing was adequate as to M.P., whose severe mental and emotional issues left her without a stable foster home or parental figures.

Father contends the court further erred in terminating his parental rights as to D.P. He contends there was evidence to support the parental-benefit exception to adoption, and that the court's analysis was legally flawed. We conclude the record does not demonstrate any error in the court's analysis, and that, even if it had, any error was harmless.

_____

[1] All statutory references are to the Welfare and Institutions Code unless stated otherwise.

FACTS

1. Detention and Jurisdiction (Aug. 2018-Sept. 2018)

Minors M.P. (age 6) and D.P. (age 1) came to the attention of SSA in August of 2018 when officers from the Garden Grove Police Department found them alone in their mother's house. D.P. was found with an open, partially filled can of beer in her hands. There were knives and cleaning chemicals on the kitchen counter, easily accessible to the children. M.P. reported that mother often left them home alone, sometimes overnight. M.P. reported that she took care of D.P. during those times, including changing her diapers. M.P. further reported that she saw incidents of domestic violence between mother and father, including hitting and biting. M.P. pointed out where father kept his beer and reported that the open beer can belonged to father.

The children were detained, and the court exercised jurisdiction under section 300, subdivision (b)(1) (failure to supervise due to substance abuse). According to the sustained petition, mother had an unresolved substance abuse problem involving methamphetamine. Father had an unresolved substance abuse problem involving alcohol. Father had previously been convicted of driving under the influence of alcohol and had engaged in domestic violence against mother while intoxicated, resulting in a criminal conviction. He had completed a six-month first offender alcohol program but continued to drink to the point of intoxication and exposed the minors to alcohol. Further, the parents physically abused M.P. by hitting the child with an open hand on her cheeks, hands, and legs, resulting in bruises. In one incident, father threw his cell phone at M.P., causing a bruise near her clavicle bone.

Father had a fairly extensive criminal history, which included assault with a deadly weapon causing great bodily injury, as well as participation in a criminal street gang.[2]

In interviews, both mother and father reported that father does not live at the house with mother and the children but visits three or four times per week and sometimes stays the night. Father stated to a social worker that he was at work when the incident resulting in removal of the children occurred and had no knowledge why the mother would leave the children home alone.

The parents were offered reunification services. Father's case plan required him to engage in parenting classes, domestic violence classes, Alcoholics Anonymous and drug testing. Father was offered six hours of monitored visits with the children.

The children were placed with a paternal aunt and uncle.

2. First Review Period (Sept. 2018-Mar. 2019)

As of the six-month review hearing, father was renting a living room in a home with several other people, including his mother. He was working full time as a landscaper. He had taken a paternity test, and the result was that he was not the biological father of either child. Nevertheless, he was deemed the presumed father of the children. (See Fam. Code, § 7611, subd. (d).)

Father's progress during the first six-month period was reported as moderate.

_____

[2] It was further alleged, as to mother, that she had two previous children, both of which resulted in dependency proceedings in which mother failed to reunify. One of the children was placed with the child's father (not the father in the current proceeding) with mother being granted supervised visitation, and the other was adopted with mother's parental rights being terminated. Because this appeal concerns only father, we will largely ignore her involvement in the proceeding below (which was, essentially, nonexistent).

4

He had completed both parenting education and anger management classes between November 2018 and January 2019.  The class administrator reported that father was "active in class, enthusiastic, cooperative, positive attitude, client verbalizes responsibility for abuse, open to learning, reported using skills learned in class."

He enrolled in an outpatient substance abuse program through the Orange County Healthcare Agency in September 2018.  His counselor reported that father attended consistently, had gotten a lot out of the program, and had completed two relapse prevention groups.  The counselor further reported that father wanted to gain something from the program, paid attention, shared in groups, and appeared to be managing his anxiety better.  Father had been randomly tested 11 times through the program, all of which were negative.

Father also participated in random drug testing through the dependency proceeding.  Between September 2018 through February 2019, he tested 46 times.  Four of the tests came back diluted.  The social worker advised father not to drink too much water before testing.  Two of the tests (Jan. 25 and 26, 2019) came back positive for amphetamine and methamphetamine.  The remaining 40 tests were negative.

Father denied using methamphetamine in January 2019 and claimed the results could not be his because he had never tested on two consecutive days.  At that time, father was enrolled in the outpatient substance abuse program where he was testing twice per week.  He tested negative throughout the entirety of that program.  The counselor "reported it was hard to determine if father was lying about having used meth in January 2019, however he had tested with negative results."

Father's initial six hours of visitation was increased to eight hours.  Father visited consistently and utilized his full hours.  He would bring food and engage with the children.  He would redirect M.P. when she was not listening.  M.P., however, sometimes expressed that she did not want to visit with her father.  Also, the caregivers reported that

5

both children returned from visits upset and were prone to tantrums and poor sleep after the visits.

Mother's progress was reported to be minimal during the first six-month period, as she engaged in few services and missed or, on a few occasions, tested positive in the vast majority of her drug tests. She did not visit the children consistently.

M.P. exhibited behavioral problems both at school and at the caregivers' home. M.P. was enrolled in counseling. Her therapist diagnosed her with adjustment disorder with mixed disturbance of emotions and conduct. The therapist also suspected M.P. had Attention Deficit Hyperactivity Disorder (ADHD). No such concerns attended D.P., who was reportedly well behaved.

In light of father's positive tests for amphetamine and methamphetamine, SSA recommended that the parents be given another six months of reunification services. The court adopted SSA's recommendation.

3. Second Review Period (Mar. 2019-Oct. 2019)

During the second review period, mother's progress toward her case plan was reported as none, and father's progress as moderate. During this period, mother acknowledged that she was using methamphetamine daily. She did not participate in any services or random drug testing.

Father had begun individual counseling. His therapist reported that he had attended 14 sessions and would be finishing treatment soon. He had not missed any sessions and had made progress during the process. She reported father had almost reached his treatment goals, which were to understand child abuse, and to understand substance abuse and its impact on family, as well as identifying issues of his own abuse.

In addition to the previous parenting classes he had completed, father participated in Home Coaching in order to assist with M.P.'s behavioral issues. He

completed the program, and his coach reported that he successfully completed all the goals of the program.

Father continued to participate in random drug testing. His tests were all negative during this reporting period. He also attended 12-step meetings.

Father consistently visited the children on his allotted days and times. Towards the end of July, he was given 3 hours of unsupervised visits on Saturdays. This was a result of his positive progress in his services. In August 2019, all eight of his visitation hours were unsupervised. The caregiver did not report any problems with the visits during this period. Both children appeared happy after the visits.

Father continued to work full time during this period as a landscaper. He claimed he earned $330 per week, which, after accounting for a $350 per month child support payment pertaining to his other children (not subjects of this proceeding), made it difficult for him to afford rent anywhere. Father requested additional time to secure a home where he could reunify with his children.

Early in the second review period, M.P. was moved out of the original caregiver's house due to behavioral issues and into New Alternatives Sibling Assessment Facility. The clinical director reported that M.P. exhibited verbal and physical aggression and had poor peer interactions. She often refused to cooperate and had tantrums when unable to do what she wanted. M.P. began seeing a new therapist who reported that M.P. suffers from ADHD and Post Traumatic Stress Disorder (PTSD).

D.P. remained in the original caregiver's home and was developmentally on track.

SSA recommended that the father be granted another six months of reunification services. SSA recommended that reunification services be terminated as to mother. The court adopted that recommendation.

4. Third Review Period (Oct. 2019-Oct. 2020)

In December 2019, M.P.'s mental health deteriorated sharply. On December 13, she was hospitalized on a section 5150 hold at CHOC Children's hospital. She had been making self-harming statements, was using a pen to scratch and poke herself, and was banging her head against a wall. She had become aggressive and threw a chair at a clinician at her placement. She later spat at a therapist, hit her, was verbally aggressive, took her own shirt off, and grabbed the clinician's vagina and butt (and did the same to another staff member). She threatened to kill staff members. She was discharged from the hospital one week later.

It was later reported that in November 2019, M.P.'s 20-year-old cousin, who lived at the same house as father and was approximately 20 years old, kissed M.P. on the mouth and exposed his genitals to her. Father described the perpetrator as having Down Syndrome. Afterwards, father was required to conduct visitation in public spaces with no guests allowed.

In February 2020, SSA recommended continuing the review hearing for 60 days to allow father to progress to overnight visitation and to start a 60-day trial visit. In preparation for the resumption of overnight visits, father agreed to not permit the perpetrator in the home while the children were present. Father had continued to participate in random drug testing with all negative results.

The court agreed to the continuance. Around this same time, D.P.'s caregivers expressed interest in providing a permanent home for her.

By April of 2020, SSA's recommendation had changed to termination of reunification services and the scheduling of a selection and implementation hearing pursuant to section 366.26 (.26 hearing) for both children. This was primarily based on two factors.

First, father had a single drug test come back positive for alcohol on March 9, 2020. Father claimed he had not consumed alcohol but instead had taken cough

8

medicine.  This was accompanied by reports from the caregivers expressing concerns that father had resumed drinking.  They claimed to have seen him drinking two beers at a family party in early February, and they suspected further drinking.  Father denied it.  As a result, SSA changed father's visitation conditions to supervised visitation.

Second, he still did not have stable housing where the children could live long term.  Although he made some efforts to secure stable housing, those efforts were not to the satisfaction of the social worker.  As she explained in her evaluation, "The undersigned has provided father [with] all of the resources that the undersigned is aware of, to assist him with obtain[ing] stable housing.  In January 2020, the father admitted that he had not called the apartment list provided or the housing referrals provided.  In February 2020, the father reported he declined a one-bedroom apartment because he did not yet need it.  The undersigned is concerned with father's lack of follow through and insight regarding obtaining stable housing."  In a meeting with father, the social worker explained that "due to the legal [Family Reunification] timeframes, the SSA's recommendation will be to terminate [Family Reunification] services and set a .26 hearing . . . ."

After that report, SSA provided an addendum report in June 2020.  The social worker had required father to re-enroll in a substance abuse program, but when he tried to do so, he was rejected.  The program coordinator explained to the social worker that a one-time use of alcohol did not qualify him for a substance abuse program.  Father, nevertheless, voluntarily attended the substance abuse program and had attended four to five phone sessions.  Father had continued drug testing and all of his tests had been clean since the prior report.

Father's housing situation was largely unchanged—he was still living in the same house.  However, about a week before the addendum report, he stated he intended to move to another family member's living room where he claimed the children could

9

stay with him. SSA had not done a background check on the residents of that house because father had not provided information on the existing residents.

SSA prepared another addendum report in August 2020. In July 2020, the social worker had been contacted by father's sister (the owner of the house where he claimed he had been staying). The sister reported that father had not been residing in her home since March 2020, but instead had only been there for the overnight visits with the children. As to those visits, she claimed father did not take care of the children and fell asleep before the children did. She claimed to have seen father drinking beers and expressed a general skepticism of father's character and ability to care for the children. She reported that father has other children, one of whom is a minor, and he has not cared for those children.

The social worker followed up that conversation by contacting father and asking about his housing. Father claimed he had not yet moved in with his niece and claimed, falsely, to still be living with his sister. When the social worker confronted him with his sister's claims, he dissembled. "The undersigned once again reviewed the steps the father needed to take [to reunify] such as having a stable home, providing proof of income, taking an active role in his children's lives, demonstrating he understood what they needed and how those needs should be met as well as showing interest in their daily lives by calling the caregivers and attending appointments, and continuing to maintain his sobriety." About a week later, father reported that he would be moving into the living room of a friend's house. When asked how much the rent would be, father claimed to have not yet discussed it. He also admitted he had not discussed M.P.'s behavioral issues with the friend. When asked about his previous plan to move in with his niece, he responded that she had not provided information about who lives in the home.

The social worker then began probing father about his knowledge of the children's needs. He did not seem to have a solid grasp of how to feed them or how he would ensure M.P. could continue attending the various services she needed. The social

10

worker expressed concern that father had not taken initiative to be involved in the children's daily lives or ask questions if he did not understand something.

During this period, father remained consistent in his visitation, but due to the pandemic the visits were by video and quite short. According to the social worker's report, "The video calls tend to last a few minutes with both children. The child [M.P.] often does not want to speak, or wants to leave the Zoom video call. Based on summaries from the group home, the father is noted to ask the child how she is doing and what she is doing and the calls are three to five minutes."

D.P. likewise showed little interest in the video call visits. She refused to attend two visits. When she did visit, she greeted father by his first name. The social worker asked D.P. about visits with her father, and D.P. pointed to her foster father and said, "Mi papa." When the social worker asked D.P. about visits with father (referring to him by his first name), she stated she did not want to go. The caregiver reported she sometimes bribes D.P. with candy to attend the visits. The caregiver expressed concerns about returning the child to father, including a concern that he was still drinking and that he was subject to an immigration deportation order. The caregiver further reported that father never inquired about D.P.'s well-being.

SSA prepared another addendum report in September 2020. In August father moved in with the friend he had referenced before. However, he still had not shared details of M.P.'s behavioral issues with the friend, describing her only as having a difficult character and in need of therapy. Moreover, he said the social worker could not visit the home, at this time, but could in one month when the friend's mother-in-law moved out. In September he reported that the kids could not currently reside with him at the friend's house because the friend's mother-in-law was sick and living in the home. He continued to demonstrate only a cursory understanding of M.P.'s issues and needs. He had not provided verification of his income. During this period he tested positive for alcohol on two occasions in August and missed one of his August tests. Father once

11

again claimed it was because of cough medicine, but the testing laboratory disagreed, stating, "'An extra dose of Nyquil will not account for either of these results.'"

M.P. continued to resist participating in visits. On one occasion she yelled at father, told him she hated him and walked out the door. M.P. missed two visits after in-person visitation resumed.

Video calls with D.P. continued to be short and largely unresponsive, with D.P. leaving the calls early. D.P. would play with father during in-person visits.

SSA prepared a fifth addendum report in October 2020. Father had another positive alcohol test in September. He still had not obtained stable housing. M.P. was continuing to refuse to participate or engage in visits with father.

The court held an 18-month review hearing on October 16, 2020, at which time it terminated reunification services for father. Father and SSA had negotiated a settlement, which the court adopted, for a "soft 366.26 agreement." Pursuant to that agreement, SSA would keep existing services available for father through the date of the .26 hearing, which was set for February 16, 2021. SSA had no further obligation to provide additional referrals for services. Nor was SSA obligated to follow up with current service providers. Further, SSA was authorized to terminate the drug testing referral if any tests came back positive for drugs or alcohol, or if a test was missed or diluted without excuse. "This negotiated settlement does NOT extend the reunification period in any manner. Family reunification services are terminated and a section 366.26 hearing, which could include a recommendation for termination of parental rights and a permanent plan of adoption, is being set for February 16, 2021."

On February 3, 2021, father filed a petition to change the court's order pursuant to section 388. With regard to housing, father's attorney declared the following: "[Father] currently has moved to a four bedroom apartment with his girlfriend Maria Galvan. This apartment has room for his daughters to have their own room and live with a family including his girlfriend, her mother and sister as well as two of her children.

12

Further, in addition to the assistance of his girlfriend Maria Galvan, he has obtained childcare options through family . . . and [a] local childcare provider . . . ." With regard to alcohol consumption, the attorney declared, "[S]ince [the setting of the .26 hearing father] has engaged in further treatment and shown that relapse to be a setback and not a new path as well as working hard and now providing a stable and positive home for his daughters to join him." Attached to the petition was a letter from a mental health specialist at the Orange County Health Care Agency confirming that father had been enrolled in their outpatient substance abuse program since March of 2020 and was currently in the recovery maintenance program. The petition also included a declaration from father's girlfriend confirming that they had been dating since November 2020 and affirming her willingness to care for the children and let them live at her apartment.

On February 14, 2021, SSA filed its .26 hearing report. The recommendation as to D.P. was to terminate parental rights and select adoption as the permanent plan. D.P.'s current caregivers (the paternal aunt and uncle), with whom she had lived most of her life, were willing to adopt. The recommendation as to M.P. was to not terminate parental rights, but instead for her to remain in foster care with a permanent plan of "placement with a fit and willing relative . . . ." SSA concluded that D.P. is both specifically and generally adoptable. Regarding M.P., however, it found that as a result of her behavior and emotional issues, "there is no one available to become her legal guardian. Based on the information provided above, it appears the child should remain in foster care with a permanency plan to place with a fit and willing relative, as appropriate. There will be no adoption assignment at this time." SSA was assessing a possible placement of M.P. with her maternal grandmother in Tijuana.

Regarding father's substance abuse, after the previous hearing, father had one more positive test result for alcohol, and one diluted test.

Regarding visitation, little had changed since the prior report.

13

On March 17, 2021, SSA submitted an addendum report with an updated diagnosis for M.P.'s emotional and behavioral issues. M.P. had been diagnosed with ADHD, PTSD, Major Depressive Disorder, Oppositional Defiant Disorder, Disinhibited Attachment Disorder of Childhood, and Autism Spectrum Disorder.

In the same addendum, the social worker responded to father's claims in his section 388 petition. The social worker maintained that "father has continued to have an unresolved substance abuse problem," as indicated by his more recent positive tests for alcohol. Regarding father's prospective housing with his new girlfriend, the social worker expressed the following concern: "The undersigned is concerned about the stability of the children, if they were to be released to the father, should the father and his girlfriend break up. The father has indicated that it is a new relationship and he and his girlfriend had only been together since about Christmas 2020. If things did not work out between them, the father would lose his housing, and the support he now claims to have. The father has had over two years to locate a stable residence, has been provided with ongoing, numerous referrals and has been referred to SSA housing assistance programs, but had inconsistent and poor follow through [and] was unable to locate a residence where he could reunify."

On April 2, 2021, M.P. was moved from her group home to a foster home. She appeared in good spirits, stated she felt comfortable in the home and was happy to be there. She referred to her new foster mother as "mommy." The foster mother expressed an interest in adopting M.P. in the future.

On April 19, 2021, SSA prepared another addendum report. The social worker reported that D.P. was in good health and developmentally on track. She called her caregivers "mommy" and "daddy" and was observed playing happily with them. She was in a "stable home where she is afforded the opportunity to thrive to her fullest potential."

14

On April 23, 2021, the court held a hearing on father's section 388 petition. It denied the petition without an evidentiary hearing on the ground that father had not made a prima facie case for relief. The court accepted, for the sake of argument, all of the evidence set forth in father's section 388 petition. However, the court considered the late stage of the proceedings and concluded father's circumstances, though somewhat changed, had not sufficiently changed to warrant reopening reunification services, taking into consideration the best interests of the children. In reaching this conclusion, the court nevertheless praised father's efforts: "This is a hugely different person that stands before us now, and perhaps in a completely different posture than you've ever been in your life." "So I want to acknowledge—and not just acknowledge. I truly appreciate, really, the fundamental work that is going on in that quest for sobriety."

The court proceeded to hold a contested .26 hearing on April 28, 2021. Shortly after the hearing began, the matter was continued, ultimately to May 27, 2021.

Prior to the continued hearing, SSA prepared an additional addendum report. Unfortunately, M.P.'s foster parent gave a 14-day notice to have her removed from the home. M.P.'s behavioral concerns had required the foster parent to take too much time off work. Also, M.P. had, on two occasions, choked the foster mother's 5-year-old nephew. What seems to have been the straw that broke the camel's back was an evening when M.P. was acting physically aggressive toward the caregiver and her family, including hitting, scratching, throwing things, and attempting to stab the caregiver with a piece of wood she found on a dresser. M.P. also engaged in self-harming behavior, such as scratching herself and banging her head against a wall. M.P. was placed at Orangewood Children and Family Center on May 25, 2021.

During this time period, M.P. continued to refuse visitation with father.

At the continued .26 hearing, on May 27, 2021, father testified to the sorts of games and activities he did with the children when they were living with him and during visitations. He described the love he had for the children and the satisfaction he

15

gained from their love for him. At the end of the hearing, father's counsel argued that the parental-bond exception should apply to avoid selecting adoption as the permanent plan for D.P. Minor's counsel argued in favor of adoption for D.P.

Once again, the court applauded father, saying, "You've done some amazing work." "I can't say enough about how impressed I am with the work you've done." Ultimately, however, the court explained, "I can say that this is going to be a little difficult because the timeline for these girls is just—it's still very clear, and it doesn't necessarily fit the timeline on other ends." Accordingly, the court adopted SSA's recommendation with regards to both children: as to M.P., foster care; as to D.P., termination of parental rights and adoption. Father appealed.

## DISCUSSION

Father raises two issues on appeal. First, he contends the court erred in denying his section 388 petition at the prima facie stage. Second, he contends the court erred in terminating parental rights as to D.P. because it failed to engage in the analysis required by our high court's recent decision in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) as it pertains to the parental-benefit exception to terminating parental rights.

## 1. The Section 388 Petition

"Under section 388, a parent may petition to change or set aside a prior order 'upon grounds of change of circumstance or new evidence.' (§ 388, subd. (a)(1); see also Cal. Rules of Court, rule 5.570(a).4) The juvenile court shall order a hearing where 'it appears that the best interests of the child . . . may be promoted . . .' by the new order. (§ 388, subd. (d).) Thus, the parent must sufficiently allege *both* a change in circumstances or new evidence *and* the promotion of the child's best interests." (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1157, fn. omitted.)

16

"The parent need only make a prima facie showing to trigger the right to proceed by way of a full hearing." (*In re Marilyn H*. (1993) 5 Cal.4th 295, 310.) "A prima facie case is made if the allegations demonstrate that these two elements are supported by probable cause. [Citations.] It is not made, however, if the allegations would fail to sustain a favorable decision even if they were found to be true at a hearing. [Citations.] While the petition must be liberally construed in favor of its sufficiency [citations], the allegations must nonetheless describe specifically how the petition will advance the child's best interests." (*In re G.B.*, *supra*, 227 Cal.App.4th at p. 1157.) "In determining whether the petition makes the required showing, the court may consider the entire factual and procedural history of the case." (*In re K.L.* (2016) 248 Cal.App.4th 52, 62.) "We review a juvenile court's decision to deny a section 388 petition without an evidentiary hearing for abuse of discretion." (*Ibid.*)

We begin with father's showing of changed circumstances. As to father's alcohol consumption, nothing had really changed since the 18-month review hearing. Father had already completed most of his services by that time, and though he was sober more often than not, he was still struggling to maintain consistency. At the time of the hearing on his section 388 petition, which was approximately six months later, that was still true. The only significantly changed circumstance since his 18-month review hearing was the fact that he had moved in with a girlfriend who he had been dating for approximately three months, and who was willing to house the children in her apartment.

We turn, then, to the children's best interests, and in doing so we will analyze each child separately as their circumstances were vastly different.

D.P. moved in with the caregivers when she was only one year old. At the time of the hearing on the section 388 petition in April 2021, D.P. was approximately four years old. As a result, she had been living with her caregivers for more than half of her life, with her only memories based on living with them. She referred to the caregivers as "mommy" and "daddy," and, by contrast, referred to father by his first

17

name. Her caregivers had provided her with a stable and loving home where all of D.P.'s needs were met and she was living a happy childhood.

Father's only showing of D.P.'s best interest in his petition was the following contention: "My children are currently separated and without their parents. I have completed services and created a home for both of my children to be with me in a stable environment. Further, I am aware of [M.P.'s] special challenges and needs and can provide for her and meet those needs. I am bonded to both children and show this in visitation. This change of orders will let them maintain their family bond and is in the best interests of both of my daughters."

The flaw in father's reasoning is that, from D.P.'s perspective, she was *not* separated from her parents. She was living with the only parents she had ever known. To take her away from her parental figures would undoubtedly be extremely traumatic. This was clearly not in D.P.'s best interest. Indeed, having spent so much time with her caregivers, and having bonded with them so thoroughly, it would not change the outcome if father had maintained perfect sobriety and could demonstrate that housing with his girlfriend was extremely secure. It still would plainly not be in D.P.'s best interest to remove her from her parental figures, with whom she had spent two and a half years. As our high court noted, "While this may not seem a long period of time to an adult, it can be a lifetime to a young child. Childhood does not wait for the parent to become adequate." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.) Thus there was no abuse of discretion in denying the section 388 petition at the prima facie stage as to D.P.

The situation was quite different, however, with regard to M.P. Unlike D.P., M.P. did not have the benefit of a stable home with parental figures in her life. She had been bounced around between group homes and foster homes. Moreover, as a result of her extreme behavioral and emotional issues, her prospects for a permanent home were grim. Against all odds, SSA had found a foster placement for her toward the end of the proceeding, which seemed at first to be going well and had the potential to provide

18

permanency. Tragically, however, M.P.'s violent tendencies thwarted that opportunity. In this context, the prospect of a stable home with a committed parent is a potential game changer for M.P.

We recognize that the evidence as to the stability of father's housing was thin. In any other context, this may not have been a sufficient changed circumstance, but M.P.'s circumstances are dire, and the challenges ahead formidable (especially the grim prospects of finding a permanent home). There are, of course, outstanding questions about the stability of father's housing with his girlfriend, questions about the extent of father's alcohol use, and questions about father's ability to meet M.P.'s extensive needs. But construing father's petition liberally, as we must at the prima facie stage, he has put forth just enough evidence to meet the low threshold of probable cause such that the court should have granted him an evidentiary hearing as to M.P. only. The outstanding questions should be explored in depth at the evidentiary hearing. In reaching this conclusion, we neither explicitly nor implicitly suggest what the outcome of the evidentiary hearing should be. Only that there should be one.

2. Termination of Parental Rights

Next, father contends the court erred in terminating his parental rights as to D.P. and selecting adoption as the permanent plan because the parental-benefit exception applied. We disagree.

At a .26 hearing, the court must select a permanent plan for a child. Where the child is adoptable, the preferred permanent plan is to terminate parental rights and free the child for adoption. (§ 366.26, subds. (b)(1), (c)(1).) However, "Even when a court proceeds to select a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute. One of these is the parental-benefit exception. What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly

19

visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child. (See Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i); Evid. Code, § 115.) The language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child. While application of the beneficial parental relationship exception rests on a variety of factual determinations properly reviewed for substantial evidence, the ultimate decision that termination would be harmful is subject to review for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at pp. 629-630.)

"The first element — regular visitation and contact — is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).) Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child, even as courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C., supra*, 11 Cal.5th at p. 632.)

"Concerning the third element — whether 'termination would be detrimental to the child due to' the relationship — the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. (§ 366.26, subd. (c)(1)(B); see also § 366.26, subd. (c)(1)(D).) Because terminating parental rights

20

eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship — in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C., supra*, 11 Cal.5th at p. 633.) "When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s). Nothing that happens at the section 366.26 hearing allows the child to return to live with the parent. [Citation.] Accordingly, courts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at p. 634.)

Father contends the court erred by relying on father's substance abuse in deciding to terminate his parental rights. As our high court explained in *Caden C.*, "A parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the [parental-benefit] exception. . . . [M]aking a parent's continued struggles with the issues leading to dependency, standing alone, a bar to the exception would effectively write the exception out of the statute. In cases like this one, when the court sets a section 366.26 hearing, it terminates reunification services for the parent. [Citation.] Thus, when the court holds a section 366.26 hearing, it all but presupposes that the parent has not been successful in maintaining the reunification plan meant to address the problems leading to dependency." (*Caden C., supra*, 11 Cal.5th at p. 637.) Nevertheless, "issues such as those that led to dependency often prove *relevant* to the application of the exception. (*Ibid.*, italics added.) "A parent's struggles may mean that interaction between parent and child at least sometimes has a "'negative" effect' on the child." (*Ibid.*)

21

There is nothing in the record here to suggest that the court considered father's alcohol use a categorical bar to applying the parental-benefit exception. Father focuses on the following comments from the court: "So this is kind of the message I want you to hear, because, first of all, the court absolutely appreciates the person coming in that has done the work, that, again, this is not looking at the drug test or the alcohol test as a negative, in some ways; it may not fit with our timelines; it may not fit with where we are with this case with the girls, but to look at how much work you've done, I just have to commend you on that." "So those tests, while not a negative, it's a situation we have to deal with on the law." "So I can't say enough about how impressed I am with the work you've done. I can say that this is going to be a little difficult because the timeline for these girls is just — it's still very clear, and it doesn't necessarily fit the timeline on other ends." "[T]his is the court really following the law in the interests of these girls, as difficult as it may be to hear."

We do not interpret the court's comments as running afoul of *Caden C.'s* guidance on how substance abuse interacts with the parental-benefit exception. The point the trial court was making was simply this: father made a lot of excellent progress, but the progress came too late for reunification, and now the court must do what is in the best interests of the children. That is the correct analysis.

Moreover, to the extent the court failed to engage in the analysis called for by *Caden C.*, the error was harmless. (See *In re Celine R.* (2003) 31 Cal.4th 45, 60 [error in juvenile dependency proceeding is reversible "only if the reviewing court finds it reasonably probable the result would have been more favorable to the appealing party but for the error"].) There is nothing in the record to suggest father's bond with D.P. would have warranted applying the parental-benefit exception. Taking into consideration the factors *Caden C.* described above, D.P. was very young, spent most of her life with the prospective adoptive parents, and did not display any particular bond to father during visitation. At times D.P. had to be bribed to attend visitations, and although sometimes

22

she enjoyed the visits, at other times she refused to attend.  On the whole, the record demonstrates that D.P. may have enjoyed her time with father, who she referred to by his first name, but considered her prospective adoptive parents to be her "mommy" and "daddy."  Under these circumstances, it is not reasonably probable that father would have achieved a different result even if the court had articulated the complete analysis described in *Caden C.*, *supra*, 11 Cal.5th 614.

## DISPOSITION

The court's order denying father's section 388 petition as to M.P. is reversed, and the court is instructed to hold an evidentiary hearing.  In all other respects, the court's orders are affirmed.

MARKS, J.*

WE CONCUR:

O'LEARY, P. J.

MOORE, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.