Filed 10/10/23  In re S.P. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re S.P., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E081330 |
| Plaintiff and Respondent, | (Super.Ct.No. J287288) |
| v. | OPINION |
| L.P., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Cara D. Hutson, Judge.  Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, Joseph R. Barrell, Deputy County Counsel for Plaintiff and Respondent.

1

Defendant and appellant L.P. (Mother) appeals after the termination of her parental rights to S.P. (born Nov. 2018, hereinafter Minor) at a Welfare and Institutions Code section 366.26[1] hearing. Mother contends on appeal that (1) the juvenile court erred by denying her section 388 petition without a hearing; and (2) the juvenile court erred by finding the beneficial-parental bond exception to termination of parental rights did not apply.

**FACTUAL AND PROCEDURAL HISTORY**

A.    <u>DETENTION</u>

On November 3, 2020, the San Bernardino County Children and Family Services (Department) received a 10-day response referral for Minor due to the death of a sibling, Z.P., who was born in November 2019 and died less than one year later. Mother had two other children, S.H., who was born in June 2011, and L.J., born in June 2010 (collectively, Siblings). It was reported that Z.P. had died while in Mother's care.

Law enforcement who responded to the call of Z.P.'s death on November 4, 2020, spoke with Mother. Mother reported having a party at the residence on the prior day. Responding officers found beer cans throughout the residence, baggies of marijuana on the floor, pills on window sills, and an unknown white substance on the kitchen counter. Mother appeared to be intoxicated. Mother advised law enforcement that on November 3, 2020, at approximately 4:00 a.m., Mother gave Z.P. Tylenol because Z.P. had a cold. Mother and Z.P. both slept on the floor in the living room. At around 9:00 a.m. the next

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

morning, Mother woke up and helped her other children get ready for school. She noticed that Z.P. was sleeping on her stomach. Mother went back to sleep until 1:30 p.m. When Mother awoke, she tried to wake Z.P., but she was deceased. Law enforcement arrived at approximately 2:00 p.m. An autopsy had to be conducted on Z.P. in order to determine the cause of death.

A social worker from the Department visited Mother's home on November 12, 2020. Mother reluctantly allowed the social worker into her home. There was no furniture in the living room. Mother stated that she lived alone in the home with Minor and Siblings. Mother was evasive when questioned about Z.P.'s death and did not express any emotion regarding her death. Mother reported that she and Z.P. routinely slept together on blankets in the living room; she did not have a crib. Mother was not sure how many people were in her home on the night of Z.P.'s death. She was having a birthday party for Minor and only relatives were in attendance. She admitted drinking "one beer" that night. She denied using drugs. Mother denied that there were any illegal substances in her home when law enforcement arrived.

An interview warrant had to be obtained for the social worker to speak with Minor and Siblings as Mother did not make the children available to the Department. Minor and Siblings appeared in dirty clothes and messed-up hair. They immediately denied that Mother ever hit them. They felt safe in the home. They all reported that the night of Z.P.'s death, Mother had a party for Minor for his birthday. When they woke up the next day, they attended online school and then discovered that Z.P. had not woken up. They all went to the hospital with Mother and Z.P. was announced deceased. S.H. was the

father of Siblings; Minor's father was reported by Mother to be D.J., who was serving a life sentence in prison. Mother had no prior history with the Department and no known criminal history.

A detention warrant was obtained and Minor was detained. Minor was placed with maternal aunt, Ms. S., on November 13, 2020.

The Department filed a section 300 petition against Mother for Minor on November 17, 2020 (Petition). The father was stated to be D.J. It was alleged in the Petition under section 300, subdivision (b), failure to protect, that Mother was under the influence while caring for Minor, which impacted her ability to care for him, and she was unable to provide a safe living environment for Minor based on dangerous substances being found that were easily accessible to him which impacted Mother's ability to care for him. It also was alleged pursuant to section 300, subdivision (f), that Z.P. died while in Mother's care and the cause of death was unknown; and pursuant to section 300, subdivision (g), that D.J.'s whereabouts were unknown and he failed to provide support to Minor. Mother denied any Indian ancestry.

A detention hearing was held with Mother present on November 18, 2020. The juvenile court found a prima facie case that Minor came within section 300 and that detention should be outside the home. S.H. was present and requested custody as a nonoffending parent.

B.    JURISDICTION/DISPOSITION REPORT AND HEARING

The jurisdiction/disposition report was filed on December 4, 2020. The Department recommended that Minor remain out of the home and that reunification

4

services not be granted to Mother for Minor pursuant to section 361.5, subdivision (b)(4), death of another child.  Siblings had been placed with S.H. and it was recommended that the dependency be dismissed as to them.  Z.P.'s cause of death was still unknown.

Mother was interviewed on December 2, 2020, regarding the party on the night of Z.P.'s death.  She claimed to have had only one glass of wine and it did not impact her ability to care for Minor, Siblings, and Z.P.  The white powder in the kitchen was chalk.  There were beer cans in the apartment because she collected cans and did not have a trash bag.  She denied that she smoked marijuana; she never saw marijuana in her house.  D.J. was in prison for attempted murder until June 2043.  L.J. reported that she had observed Mother consume beer, but not every day.

The Department stated that Mother had not accepted responsibility for her actions, which led to the removal of Minor and Siblings from her care.  Mother had attended only one visit with Minor.  The Department had been unable to get Mother to schedule any other visits.  Mother had one negative drug test.  Mother reported that D.J. had not been present at Minor's birth and never provided for Minor.  The Department recommended that D.J. be named the alleged father.

An autopsy was performed on Z.P.  The coroner could not determine the cause or manner of death.  There were no signs of trauma nor any other obvious signs of death.  The police report from the night of Z.P.'s death was attached to the jurisdiction/disposition report.  The reporting officer noted that there were several empty beer cans in the apartment along with baggies of marijuana.  There was some type of crushed up pill found in the living room.  When Mother was interviewed, the officer

5

noted a strong odor of alcohol coming from Mother.  Paternity testing for D.J. was ordered.

Additional information was provided to the juvenile court on February 3, 2021, and May 4, 2021.  Mother was referred to a substance abuse treatment program.  Further, photographs of Mother's apartment on the night of Z.P.'s death were submitted, which included photographs of a white substance, marijuana baggies on the floor, pills on a windowsill, and beer cans.  There was just a mattress and blanket on the living room floor.  The home was very unkempt and dirty.  Paternity testing revealed that D.J. was not the biological father of Minor and it was recommended he be removed from the case.  The autopsy report was submitted to the juvenile court.  Toxicology reports showed that no substances were in Z.P.'s system that would have caused her death.  The cause of death was "unexplained sudden death."

The jurisdiction/disposition hearing was to be held on May 5, 2021.  Mother was present.  D.J. was excluded as a possible father of Minor; Mother named B.T. as the possible father of Minor.  The matter was continued in order for B.T. to be noticed of the hearing.  The Department was now recommending that Mother be granted reunification services.

An addendum report was submitted on June 21, 2021.  The Department recommended that the allegations in the Petition be found true and that Mother be granted reunification services.  Siblings were placed with S.H. and the dependency should dismissed as to them.  Minor had been moved to the foster home of Ms. D.  Mother had been engaged in a drug treatment program and tested negative on a drug test.

It had been reported that Mother was unable to handle Minor during visits. He had been observed climbing on furniture, throwing himself on the floor, punching and screaming at Mother when she tried to redirect him. Visits had been described as "chaotic and out of control." Minor had been diagnosed with trauma/stress related disorder. He was frequently irritable and threw tantrums. He was aggressive toward other children. B.T. could not be located. Mother was making some progress in her drug treatment program but had not completed all of her requirements. The treatment program was extended to August 19, 2021. Mother completed her parenting class but it was recommended that she continue in individual therapy.

The jurisdiction/disposition hearing was held on August 10, 2021. D.J. was declared a nonparty and B.T. was named the alleged father. The juvenile court adopted all the findings and orders in the jurisdiction/disposition report. The juvenile court found that ICWA did not apply. Reunification services were granted for Mother. Siblings were placed with S.H. and the dependency as to them was dismissed. The section 300, subdivisions (g), and (f), allegations in the Petition were dismissed. All of the section 300, subdivision (b), allegations were found true for Minor and Siblings against Mother.

C.    REVIEW REPORTS AND HEARINGS

The Department filed a review report on February 8, 2022. It was recommended that reunification services be continued. Minor had been moved to the foster home of Mr. and Mrs. W. He had been in the placement for five months and was adjusting well. He was much calmer since he had been in their care. Mother reported feeling depressed and had a hard time processing the death of Z.P. Mother hoped to marry S.D., a man

7

with whom she had been living with for several months. S.D. had an extensive criminal record and became angry when questioned about his criminal history by a social worker. The Department was concerned about the relationship and whether it presented a safety risk to Minor. Minor had been diagnosed with autism and was receiving services, including therapy. Minor was doing well in his services.

Mother had completed her parenting class. Mother completed her drug treatment program on October 15, 2021. She appeared to be maintaining a drug-free lifestyle. She had several negative drug tests; a positive test for Ethanol and a no-show test. Mother was doing better at visitation, redirecting Minor as needed. Mother presented as loving, engaged, and appropriately attentive. The Department recommended unsupervised visits for Minor with Mother.

The review hearing was held on February 10, 2022. The juvenile court continued reunification services for Mother. Mother was also granted unsupervised visits as long as she did not bring S.D. to the visits.

In its review report filed on May 18, 2022, the Department requested an additional 90 days in which to further assess Mother's living arrangements with the goal of returning Minor to her care. Mother had completed all of her services and the Department believed she had benefitted from the services. She had consistently attended visitation with Minor. Mother was still residing with S.D. in a two-bedroom apartment. S.D. was being evaluated and was cooperating with the Department. Minor had a healthy bond with his caregivers. A psychological evaluation of Mother had been completed.

8

Mother was diagnosed with borderline intellectual functioning, which did not prevent her from caring for Minor, but she would need support from the Department.

Mother had unsupervised visits with Minor. She was consistent in her visitation and was able to control Minor. Mother had negative drug tests during the reporting period. Mother wanted Minor returned to her care. At a hearing held on May 19, 2022, the juvenile court ordered that once the evaluation of S.D. was complete, the Department could return Minor to Mother's care. The review hearing was continued.

At another hearing on August 17, 2022, the juvenile court ordered that Minor could return to Mother's home for a 29-day visit. Mother's boyfriend, S.D., had to move out of the apartment and needed to have three clean drug tests before moving back in. Minor was placed with Mother.

According to an additional report filed on October 1, 2022, after Minor was placed with Mother, Mother informed the Department she was being evicted from her apartment. Mother did not know where she was going to live. As such, Minor was placed back with Mr. and Mrs. W. on August 26, 2022. Also, Mother had tested positive for fentanyl on August 30, 2022, and was a no-show for a test on September 2, 2022. Mother called one of the social workers to report she was staying in a hotel with S.D. S.D. could be heard in the background yelling obscenities. S.D. had failed to submit to drug testing. The Department recommended that Mother's reunification services be terminated and that the matter be set for a section 366.26 hearing.

The contested review hearing was conducted on October 25, 2022. Mother testified. She had completed all of the court-ordered services. She learned from her

9

substance abuse program not to be around alcohol. She did not know how she tested positive for fentanyl. She had never taken the substance in her life. She was willing to take responsibility for the positive test. She also denied she missed a drug test. She was willing to complete another substance abuse program if the juvenile court would continue reunification services. Mother had left S.D. and was looking for housing. Mother's counsel requested six months of additional reunification services. The Department was requesting termination of reunification services; there was no substantial probability of Minor returning to Mother's care.

The juvenile court found that Mother had not made substantial progress in her court-ordered case plan. Mother had received over two years of services. Mother's reunification services were terminated and the matter was set for a section 366.26 hearing. Mother's visits with Minor would be supervised.

D. SECTION 366.26 REPORT, SECTION 388 PETITION, AND HEARING

The section 366.26 report was filed on February 14, 2023. Minor remained in the care of Mr. and Mrs. W. They were willing to adopt Minor. Both caregivers had bonded with Minor. There was much affection between Mr. and Mrs. W. and Minor. They could give Minor the structure and protection that he needed. They were willing to continue contact with Mother and Siblings as long as it was positive contact. Mother had been granted weekly monitored visits on November 2, 2022, but had been inconsistent in visitation as the times conflicted with her work schedule. Mother was advised she could have video calls but had been sporadic in her visits. Mother brought snacks to visits. She spent one visit allowing Minor to look at her cellular telephone for the majority of the

10

time. Visits ended well with no issues. Termination of parental rights would not be detrimental to Minor.

Mother filed a section 388 petition on March 7, 2023. Mother was enrolled in a substance abuse program and continued to have negative tests. She had stabilized her housing. Mother was requesting that Minor be returned to her care with a family maintenance plan, or reinstate reunification services. Mother submitted a declaration with the section 388 petition. Since the termination of reunification services, Mother had committed herself to meet her case plan goals. She maintained her sobriety and surrounded herself with stable family members. Based on her progress, it would be in Minor's best interests to return him to her care or grant further reunification services.

On April 17, 2023, the Department responded to the section 388 petition. Mother was interviewed by the Department on April 3, 2023. She was living with an aunt in a one-bedroom apartment in Highland. She was looking for housing. She also was unemployed. Mother was continuing to attend outpatient alcohol treatment. Mother had reported not knowing how she could have ingested fentanyl but then admitted asking a friend for muscle relaxers due to injuring her foot. The Department questioned Mother's decisions and whether this could put Minor in jeopardy. The section 388 petition should be denied.

On April 17, 2023, the Department reported additional information that Mr. and Mrs. W. had changed their mind about adopting Minor as they felt they were too old to care for Minor. Minor would have to be moved to a new adoptive home. Later that day, Mr. and Mrs. W. contacted the Department and advised they had made a mistake. They

wanted to adopt Minor because they loved him and wanted to provide him with a stable home. Mother had stated that she was only available for visits with Minor on Mondays despite the Department offering her bus passes to visit Minor. Mother was only willing to visit when her aunt could give her a ride. Mother also provided documentation that she had attended 50 sessions of substance abuse programs. She had only five absences and it was reported she was doing excellent in the program. She continued to test negative.

The contested section 366.26 hearing and determination of whether an evidentiary hearing on the section 388 petition would be granted was conducted on May 17, 2023. The juvenile court denied the section 388 petition without a hearing, as will be discussed in more detail *post*.

The juvenile court then conducted the section 366.26 hearing. Mother's counsel argued for the lesser plan of legal guardianship. Mother had been consistent in her visitation. She had attempted to reschedule any missed visits based on her work schedule. Mother's counsel also noted that Mr. and Mrs. W. had been debating whether to adopt Minor. The legal guardianship would benefit Mother and the caregivers.

The Department argued that parental rights should be terminated. Minor was highly adoptable. He referred to the caretakers as "mommy and daddy." Their love for Minor outweighed any concerns the caregivers had about adoption. Granting legal guardianship would not provide the permanency and stability to which four-year-old Minor was entitled.

The juvenile court found that Minor was adoptable.  It further found that the "*Caden C.*[2] factors do not apply to this child.  Termination of parental rights would not be detrimental to him.  There's no exception pursuant to .21(c) so the Court orders termination of parental rights."  Mother's parental rights were terminated, and Minor was freed for adoption.

## DISCUSSION

A.    <u>SECTION 388 PETITION—DENIAL WITHOUT HEARING</u>

Mother contends the juvenile court should have held a hearing on her section 388 petition.  Mother insists that she presented prima facie evidence of changed circumstances and that it was in Minor's best interests to conduct the full hearing as she had continued her substance abuse treatment and tested negative after reunification services were terminated.

1.    *RULING ON SECTION 388 PETITION*

Mother's counsel argued that a full evidentiary hearing on the section 388 petition was necessary; the Department objected to the hearing.  Mother's counsel argued that a hearing should be conducted in order for her to testify about her progress.  Further, she could call any counselors who had helped her.  Mother had shown more than "changing" circumstances.  Mother had attended over 50 sessions of substance abuse programs.  Mother would graduate from the substance abuse program on June 1, 2023.  Mother had

---

2 *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden. C.*).

tested negative since the termination of her reunification services. She had ended her relationship with S.D. and was in a stable environment.

The Department argued that Mother had not shown changed circumstances. Mother remained in the substance abuse program. She had not shown a substantial period of sobriety. Moreover, there was no showing that it was in Minor's best interests to conduct the section 388 hearing. Minor was in a stable home where he would be adopted. Minor's counsel joined the Department. Mother had received two years of services and still had not completed her substance abuse program.

The juvenile court confirmed that the fentanyl test was in August 2022. The juvenile court "applauded" Mother for her efforts. However, "it's still in flux, it's still changing and there hasn't been a substantial space of time for this Court to grant her 388. That will be denied."

## 2. ANALYSIS

"Under section 388, a parent may petition to modify a prior order 'upon grounds of change of circumstance or new evidence.' [Citations.] The juvenile court shall order a hearing where 'it appears that the best interests of the child . . . may be promoted' by the new order." (*In re K.L.* (2016) 248 Cal.App.4th 52, 61 (*K.L.*) " 'There are two parts to the prima facie showing: The [petitioner] must demonstrate (1) [either] a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the [child].' " (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079.)

" 'A prima facie case is made if the allegations demonstrate that these two elements are supported by probable cause. [Citations.] It is not made, however, if the

14

allegations would fail to sustain a favorable decision even if they were found to be true at a hearing. [Citations.] While the petition must be liberally construed in favor of its sufficiency [citations], the allegations must nonetheless describe specifically how the petition will advance the child's best interests.' [Citation.] In determining whether the petition makes the required showing, the court may consider the entire factual and procedural history of the case." (*K.L.*, *supra*, 248 Cal.App.4th at pp. 61-62; see *In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)

"The conditional language of section 388 makes clear that the hearing is only to be held if it appears that the best interests of the child may be promoted by the proposed change of order, which necessarily contemplates that a court need not order a hearing if this element is absent from the showing made by the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 807, fn. omitted.) "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

"We review a juvenile court's decision to deny a section 388 petition without an evidentiary hearing for abuse of discretion." (*K.L.*, *supra*, 248 Cal.App.4th at p. 62.) "It

15

is rare that the denial of a section 388 motion merits reversal as an abuse of discretion." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 522.)

Mother insists she had shown changed circumstances by attending the substance abuse program beginning on November 17, 2022—after reunification services were terminated—and was consistently attending and testing negative. As of the filing of the section 388 petition on March 7, 2023, Mother was still in the process of receiving substance abuse treatment. Her graduation date was June 1, 2023.

Prior to the termination of reunification services, Mother had completed a substance abuse program and was on track to have Minor placed back in her care. The juvenile court granted unsupervised visits and the plan was to place Minor back with Mother with Family Maintenance services. She was given a 29-day visit, which had to be terminated early because she was evicted from her apartment. Despite being given the chance to end the dependency, Mother relapsed, testing positive for fentanyl, and then failing to show for a drug test. Mother first claimed she had no idea how the fentanyl was in her system, and then acknowledged taking something given to her by a friend. At this point, the dependency proceedings had been ongoing for over two years and Mother had been sober for almost one year. Mother was given an opportunity to regain custody of Minor but was unable to maintain her sobriety.

Mother had Minor removed from her care not only because the juvenile court found that Mother's substance abuse impacted her ability to care for Minor, but also because substances were found in the apartment that were accessible to Minor. Marijuana baggies and pills were found out in the open in her apartment. Mother's

16

relapse by using fentanyl was particularly concerning as she initially denied any knowledge of how it could appear in her system. Later, Mother admitted she asked a friend for a muscle relaxer and it could have contained fentanyl. The juvenile court could reasonably be concerned that Mother may expose Minor to controlled substances and that she would be unable to maintain her sobriety in order to care for Minor.

Mother insists that she had shown prima facie evidence that it was in Minor's best interests to be returned to her care or for the extension of reunification services. She insists she had overcome her substance abuse problem. However, Mother had completed a substance abuse program in October 2021. Almost one year later, in August 2022, prior to the termination of reunification services, Mother relapsed, with a much more potent drug than alcohol, by testing positive for fentanyl. Further, Mother initially did not accept responsibility for the positive test. This was similar to Mother initially denying to the Department that there was marijuana and pills in the apartment when law enforcement arrived at her apartment after Z.P.'s death. However, photographs provided by law enforcement clearly showed the illegal substances out in the open in the apartment and easily accessible to Minor. Mother had not completed the second substance abuse program, and despite making progress by attending sessions, and testing negative, the juvenile court did not abuse its discretion by considering this as evidence of only changing circumstances.

Mother also insists she had a strong bond with Minor. She acknowledges that Minor was bonded to the adoptive parents but insists she had a strong bond with Minor. The Department reported that at the initial visits between Mother and Minor, Mother had

17

a very difficult time controlling Minor.  As the visits continued, and after Minor had been placed with Mr. and Mrs. W. for four months, Mother became better at controlling Minor.  She was loving and supportive of Minor.  However, there was nothing that supports that Minor was bonded to Mother.  Some visits with Mother were unsupervised so no report of their interactions was provided.  Moreover, during one visit, Mother entertained Minor on her cellular telephone and the Department was unable to assess any bond between them.  There were reports that visits ended well and there were no issues.  However, there were no reports of any change in behavior by Minor at the end of visits, or that he had any particular bond with Mother, with whom he had been out of her custody for over two years.  He was bonded with Mr. and Mrs. W., and considered them "mommy" and "daddy."  There was a strong bond between Mr. and Mrs. W., and Minor, but no evidence of any true bond between Mother and Minor.  Mother failed to show it was in Minor's best interests to order a hearing.

The juvenile court was presented with evidence of Mother's ongoing participation in a substance abuse program.  She had not completed the program and Minor had been out of her care for over two years; he spent half of his life in the care of other persons.  Mother failed to make a prima facie showing of changed circumstances or new evidence that it was in Minor's best interests to be returned to Mother's care.  The juvenile court did not abuse its discretion by concluding that Mother had only shown changing circumstances and that it was not in Minor's best interests to restart reunification services or return Minor to Mother's care.

18

B.       BENEFICIAL PARENT EXCEPTION TO SECTION 366.26

Mother contends that she met the beneficial parental benefit exception to termination of her parental rights by showing that she maintained regular visitation with Minor and that Minor would benefit from continuing the relationship with her. It was detrimental to Minor to sever the parental relationship and the order at the section 366.26 hearing freeing Minor for adoption by Mr. and Mrs. W. should be reversed.

" 'At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.] If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.' [Citation.] 'Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).' " (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224-1225.) In order to prove that the parental bond exception applies, a parent must show (1) consistent visitation; (2) a beneficial relationship; and (3) detriment to the children in losing that relationship. (*Caden C.*, *supra*, 11 Cal.5th at p. 635.)

"A parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception." (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) However, "Issues such as those that led to dependency often prove relevant to the application of the exception. . . . A parent's struggles may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child." (*Ibid.*)

19

"[C]ourts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) "A child would benefit from continuing a strong, positive, and affirming relationship, and it would be destabilizing to lose that relationship. Sometimes, though, a relationship involves tangled benefits and burdens. In those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Ibid*.) "[C]onsideration of the beneficial relationship exception is a 'fraught determination' that requires the juvenile court to 'sift through often complicated facts to weigh competing benefits and dangers for the child[,] . . . consider practical realities over which it has limited control and envision a child's future under contingent conditions." (*In re J.D.* (2021) 70 Cal.App.5th 833, 869.)

"A substantial evidence standard of review applies to the first two elements. The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "A court abuses its discretion only when ' " 'the trial court

20

has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)

Initially, the juvenile court stated on the record that the *Caden C.* factors did not apply in this case, but did not recite its findings as to the factors. When the juvenile court finds the parental benefit exception does not apply, there is no requirement that the juvenile court state its findings on the record. (See *In re A.L.* (2022) 73 Cal.App.5th 1131, 1156 ["[W]e are aware of no requirement . . . that the juvenile court, in finding the parental-benefit exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception"].) While the trial court did not state on the record the specific findings regarding visitation and detriment, the juvenile court was aware of the *Caden C.* factors. We must presume that the juvenile court properly considered all three factors.

Mother relies on *In re D.P.* (2022) 76 Cal.App.5th 153, 169, to support her claim that remand is necessary in order for the juvenile court to conduct a new section 366.26 hearing setting forth its reasons for denying the parental-benefit exception. In *D.P.*, the appellate court remanded the case to the juvenile court in order for it to conduct a new section 366.26 hearing because the juvenile court did not provide its specific analysis on the record and it was not clear whether it considered improper factors which did not comport with *Caden C.*, *supra*, 11 Cal.5th 614. (*D.P.*, at pp. 166-167, 169.) Unlike the instant case, *Caden C.*, had not yet been decided when the juvenile court ruled on the parental-benefit exception in *D.P.* The case was reversed and remanded to allow the juvenile court to reconsider the parental-benefit exception in accordance with *Caden C.*

21

This case was decided after *Caden C.* and the juvenile court specifically stated that the factors did not apply. There is no indication in the record that the juvenile court relied on improper factors in denying the parental-benefit exception and we presume it properly followed *Caden C.*

The record supports the denial of the exception. It was Mother's burden to show that the exception applied. (*In re B.D.*, *supra*, 66 Cal.App.5th at pp. 1224-1225.)

The juvenile court properly concluded that Mother had not been consistent in visitation. The record supports that Mother was sporadic in her visits with Minor after the termination of her reunification services. The Department noted that she had missed visits and was advised she could have video visits but appeared to not take advantage of the Department's offer. Mother advised the Department that she could only visit with Minor on Monday mornings when her aunt was available to drive her. The Department offered a bus pass to visit with Minor, but she refused. Her visits remained sporadic prior to the section 366.26 hearing. Mother did not meet her burden of showing that she maintained consistent visitation with Minor.

As for the second prong, the record does not support that Mother and Minor had a beneficial relationship. Minor had been out of Mother's care for over two years. When the dependency first started, Mother had a hard time controlling Minor. During visits, Minor was out of control, and she and Siblings had to spend their visitation time trying to control Minor. Mother eventually was able to control Minor as he became calmer after moving in with Mr. and Mrs. W. Mother was allowed unsupervised visits at which there

22

was no one to observe the interactions between Mother and Minor but visits appeared to be appropriate, but unremarkable.

Mother was granted a long-term visit with Minor, but had to return Minor to the care of Mr. and Mrs. W when she was evicted and had no place to live. It was after this that Mother tested positive for fentanyl and visits were supervised. The reports from the supervised visits did not provide further evidence of a beneficial relationship between Mother and Minor. Although the visits went well, Mother entertained Minor on her cellular telephone so it was not clear how they interacted together. There was no change in Minor's behavior when visits were terminated. Mother did not show that there was a positive, emotional attachment between her and Minor to meet the second prong of *Caden C.*

Finally, there was no evidence of a strong bond between Minor and Mother, which would establish a detriment to Minor if the relationship was terminated. (See *Caden C.*, *supra*, 11 Cal.5th at p. 634 ["In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home"].) Minor's bond with Mr. and Mrs. W. was strong and they helped to provide the stability that appeared to help his behavior. Minor called Mr. W. "dad" or "uncle" and was happy living in the W.'s home. As stated, there was no evidence of a strong bond between Mother and Minor. Mother was unable to establish that the detriment of severing her parental relationship with Minor outweighed the benefit of adoption.

The juvenile court properly took into account the factors in *Caden C.* in determining the beneficial parental relationship exception did not apply.  While we recognize that Mother had worked hard to overcome her substance abuse problems, she did not meet her burden of showing that termination of her parental rights to Minor would be detrimental to Minor and outweighed the benefit of the placement in the adoptive home.  (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  The juvenile court did not exceed " ' " 'the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)  We uphold the order at the section 366.26 hearing terminating Mother's parental rights.

## DISPOSITION

The juvenile court's order is confirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER               
Acting P. J.

We concur:

CODRINGTON          
          J.

MENETREZ            
          J.