Filed 5/2/25  In re J.M. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.M. et al., Persons Coming Under the Juvenile Court Law. | B333283 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> A.W., <br><br> Defendant and Appellant. | (Los Angeles County Super. Ct. No. 19CCJP07502E-H) |

APPEAL from an order of the Superior Court of Los Angeles County, Gabriela H. Shapiro, Judge Pro Tempore. Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

Without holding a hearing, the juvenile court denied A.W.'s (Mother's) changed circumstances petition to reinstate reunification services for her four children: J.N.M., J.M.M., N.M., and L.R. (collectively, Minors). We are asked to decide whether this was error because Mother made a prima facie showing as to both requirements for the order she sought: that the circumstances had changed and that ordering additional services would be in Minors' best interest.

## I. BACKGROUND

J.N.M. was born in 2012, J.M.M. was born in 2013, N.M. was born in 2015, and L.R. was born in 2019. The proceedings giving rise to this appeal began in September 2021 and have continued for an extended period due to delays in obtaining documents pertinent to the Indian Child Welfare Act (ICWA) and related California law.[1]

---

[1] At the outset of the Department of Children and Family Service's (the Department's) investigation, Mother disclosed Minors may have Cherokee or other Indian ancestry. The Department sent notice of the proceedings to several tribes, and the Cherokee Nation responded the children were eligible for enrollment through a maternal great grandmother but had not been enrolled and "were not considered 'Indian children' per federal law." The juvenile court ordered the Department to enroll Mother and Minors in the Cherokee Nation, but delays ensued and the record does not reveal whether that had yet been accomplished at the time this appeal was taken.

2

*A.* *Investigation and Assumption of Dependency Jurisdiction*

The Department received several referrals concerning the family between 2012 and 2019. In February 2020, the juvenile court assumed dependency jurisdiction over Minors based on a finding that Mother left them home alone without adult supervision. The juvenile court terminated jurisdiction in August 2021, finding the concerns that brought Minors to the Department's attention no longer existed.

Less than one month later, the Department learned Mother's neighbors called the police because she was threatening to fight people, she was incoherent when the police arrived, and she kicked a police officer. J.M.M. and L.R. were with Mother at the time of the incident, and J.N.M. and N.M. were at a park across the street from the home, unsupervised. Mother told Fire Department personnel she "[did not] give a fuck about [Minors]" and police officers heard her say she wanted to kill three of the four children. J.N.M. also told a social worker Mother physically abused him.

The Department filed a juvenile dependency petition alleging Minors faced a substantial risk of serious physical harm based on Mother's physical abuse of J.N.M.; her use of drugs, including while Minors were under her supervision; her mental and emotional problems, "including a diagnosis of Schizophrenia, auditory hallucinations, homicidal ideations and violent and assaultive behaviors"; her failure to supervise Minors; and unsanitary conditions in the home.

Minors were detained from Mother in September 2021. The two oldest children, J.N.M. and J.M.M., were placed with their paternal grandparents. The two younger children, N.M.

and L.R., were placed with Mother's biological aunt and her sister by adoption, D.W. Mother had unmonitored virtual visits with Minors until October 2021, when she made threats against Minors' caregivers and their families. The juvenile court then restricted her to monitored virtual visits until she showed she was participating in appropriate mental health services.

When the Department interviewed Minors concerning the allegations in the juvenile dependency petition, J.N.M. reported Mother hit him with her fists and a belt, and his siblings also sometimes received "whoopings." The two other children old enough to offer a statement, J.M.M. and N.M., denied Mother physically abused them or J.N.M. J.M.M. acknowledged Mother sometimes spanked her with a belt, but she said it did not hurt. With respect to drug use, J.N.M. said Mother smoked "green stuff" "all the time," but J.M.M. said Mother only took medication prescribed to treat Crohn's disease. Mother said she only took medication prescribed to treat schizophrenia. L.R.'s father, M.R., described Mother as an "addict." Regarding the allegation that Minors did not receive appropriate supervision, J.N.M. and J.M.M. reported they went to a nearby park when Mother slept. J.N.M. also stated Mother sometimes left him to supervise his younger siblings.

Mother insisted she did not hit Minors and said she disciplined them by taking away a tablet. With respect to mental health, Mother told a Department social worker in November 2021 that she suffers from schizophrenia. The following month, Mother confirmed she was not receiving treatment or taking any medication for her mental health issues and refused a referral for services. Mother claimed Minors were "never alone" and unsupervised.

4

At a February 2022 jurisdiction hearing, the juvenile court sustained the dependency petition and ordered Minors removed from Mother's custody.  Mother was granted monitored visitation and ordered to participate in drug testing, parenting classes, and individual counseling; to undergo a psychological assessment and psychiatric evaluation; and to take all prescribed medication.

B.     *Reunification Period*

During the initial months of the reunification period, Mother missed drug tests and did not comply with her case plan other than completing a parenting class.  In June 2022, the juvenile court ordered Mother to complete a drug treatment program with testing.  Mother enrolled in an inpatient program in August 2022.  She mostly tested negative for drugs while in this program, but the Department reported the program's testing methods did not meet Department standards.

After she completed the inpatient program in November 2022, Mother moved into a sober living facility.  Mother started taking drug tests acceptable to the Department in January 2023, and she tested negative for all substances between January and March 2023.  She also participated in individual therapy, though she did not discuss case issues with her therapist.

Mother told the Department she was not taking any psychotropic medication in April 2022, but she claimed she was taking all prescribed medication before she entered the inpatient drug program in August 2022.  Mother reported she stopped taking psychotropic medication when she completed the inpatient drug program in November 2022, but she resumed taking the medication after undergoing a psychiatric evaluation in January 2023.  She enrolled in the San Pedro Mental Health Center in

5

January 2023 and attended monthly psychiatric appointments and twice-monthly individual therapy.

Mother visited the children inconsistently during the reunification period. She had little contact with the children between September 2021 and August 2022. Mother's inconsistency in visiting left J.M.M. "tearful" and caused her to act aggressively and "create[ ] a narrative as to why [M]other cannot visit more often." N.M. and L.R. "exhibit[ed] insecurity when [Mother] [wa]s not present and often ask[ed] for her." A social worker terminated a visit in April 2022 when Mother responded to J.N.M.'s discussion of physical abuse by telling him she would not seek to regain custody of him. When the social worker told Mother this comment was not appropriate, Mother suggested J.N.M. could handle it because he was 14 years old; she "appeared surprised" when the social worker reminded her J.N.M. was only nine.

Apart from a phone call with N.M. and L.R., Mother had no contact with the children between August 2022 and November 2022 when she was in the inpatient drug program. Between November 2022 and April 2023, Mother had nine visits (some virtual) with N.M. and L.R; at the first in-person visit, N.M. and L.R. appeared not to recognize Mother. Mother had six virtual visits with J.M.M. during this period and declined the Department's offers to facilitate in-person visits or longer virtual visits. Mother and J.M.M. also participated in counseling together between December 2022 and February 2023.

Minors' responses to visits with Mother were mixed. J.N.M. refused additional contact with Mother after only a handful of visits, and as of October 2022, J.N.M. "[did] not want to hear her name." J.M.M.'s visits with Mother were generally

positive, but J.M.M. cried when Mother brought up painful memories. J.M.M. told a social worker in April 2023 she worried about the prospect of unmonitored visits with Mother because "you never know what [Mother] will say or do." For example, "she could do things then ask us to keep a secret and not tell anyone what she does at home and I have to keep her secrets." N.M. also expressed a need to keep secrets for Mother.[2] Mother was affectionate with N.M. and L.R., but after visits "both children regress[ed] in their behaviors and exhibit[ed] anxious behavior, bed-wetting, aggression towards each other and insomnia."

Although some of the children exhibited behavioral issues, they were generally doing well in the homes of their respective caregivers. J.N.M. and J.M.M. were attending school and participating in extracurricular activities following "chronic absenteeism or no school enrollment for significant periods" in Mother's care. The caregivers, who initially expressed a desire to serve as legal guardians, had reconsidered and were committed to adopting Minors. J.N.M. and J.M.M. both told a social worker they wanted to be adopted by their caregivers. J.M.M. said her paternal grandparents' home was the "only place she feels protected." J.M.M. told a social worker she did not reciprocate when Mother said "I love you" because she "[did not] talk about [her] feelings like that," but she acknowledged she told her caregivers "I love you every night before bed." N.M. (seven years old in April 2023) and L.R. (four years old in April 2023) were not

---

[2]     J.N.M. told a social worker that Mother coached him and his siblings to deny abuse "during the years of [Department] investigations."

formally asked about their preferences. However, N.M. "ha[d] expressed that he [did] not want to live with his mother and want[ed] to live with his current caregiver, who he call[ed] mom or Auntie D[.]"

The juvenile court terminated family reunification services in May 2023.

###### C.    *The Post-Reunification Period and Mother's Changed Circumstances Petition*

In August 2023, in advance of a scheduled hearing to determine whether to terminate Mother's parental rights or to select another permanent plan, the Department reported Minors continued to do well in the homes of their caregivers. J.N.M. said he wanted his grandparents to adopt him "because he knows that they love him." J.M.M. said she loves her grandparents "very much" and "she understands that being adopted means that you have a 'forever home' and she wants to be adopted by her grandparents." L.R. said she liked living with her aunt D.W. and she "appeared to be very comfortable in the home." N.M. said he was "doing 'good'" living with D.W. and "he [was] 'fine' with staying with [her] if he [could not] return to his mom." D.W. reported N.M. sometimes "display[ed] vindictive behaviors" after visits and "repeatedly state[d] he want[ed] to go live with his mother." D.W., however, believed Mother was "coaching" the children and she wanted to stop the visits "because she [did] not believe they [were] helping the children and [were] instead causing the children to act out emotionally."[3]

---

[3]    D.W. told a social worker that a monitor ended a visit between Mother and N.M. when the monitor heard "grown up

8

A September 2023 hearing on whether to terminate Mother's parental rights was continued to January 2024.  Later that September, Mother filed the first of two petitions under Welfare and Institutions Code section 388 to reinstate family reunification services based on changed circumstances.[4]  The juvenile court denied this petition without a hearing, finding Mother showed neither a change of circumstances nor that resuming reunification services would promote Minors' best interest.

In October 2023, the Department reported that J.N.M. and J.M.M. were refusing to visit Mother.  J.N.M. and J.M.M. "reportedly ha[d] experienced bed-wetting, misbehaving at school, and decreased appetite after face to face visits with [M]other." J.N.M.'s academic and social skills had improved, but he "continued to struggle with insomnia, nightmares and being easily triggered/anxious when past incidents regarding [M]other . . . [were] discussed."  J.M.M. was enjoying school and had "improved coping, improved temperament, [and] reduced deceptive behaviors . . . ."  Although N.M. was doing well in school, he bullied his sister L.R. and said he wanted to leave home when D.W. disciplined him.  A social worker who observed one of Mother's visits with N.M. and L.R. remarked that they "appear[ed] bonded" to her.

In November 2023, Mother filed a second petition asking the juvenile court to reinstate family reunification services.

talk."  The record does not include any additional details concerning this incident.

[4]    Undesignated statutory references that follow are to the Welfare and Institutions Code.

9

Mother argued circumstances had changed because "[s]he completed an outpatient treatment program, [completed a] parenting class in May 2022 . . . , continue[d] to participate in mental health treatment services[,] . . . is in a sober living program where she is randomly drug tested[,[5]] . . . [and] [s]he attends Narcotics Anonymous . . . ." She argued additional reunification services would be in Minors' best interest because she "learned from her services and loves her children. She is bonded to her children and has not stopped implementing what she has learned. She works closely with her therapist and eagerly awaits visits and contact with her kids. Her goal is to be granted additional reunification and a renewed and narrowly tailored case plan for her to follow and become a better mother for her children." She asked for "more visitation as she's struggled with transportation and monitors" and emphasized she was "permitted to have children live with her in her current living situation."

A few days after Mother filed her petition, the Department notified the juvenile court that J.N.M.'s caregivers hoped to avoid bringing him to court because "the last time [he] saw [M]other in [c]ourt, his behaviors and nocturnal bed-wetting increased and did not subside for [two] months."

---

[5] Mother submitted a letter from the clinical director of the sober living program indicating she enrolled in its "self-paid sober living housing program on May 22, 2023" and, though she did not receive drug and alcohol treatment services, was still subject to random drug testing.

The juvenile court denied Mother's second section 388 petition without a hearing on November 9, 2023.[6]

## II. DISCUSSION

The juvenile court did not err in denying Mother's petition to reinstate family reunification services. Assuming the evidence of Mother's continued sobriety and participation in mental health treatment amounted to a prima facie showing of changed circumstances, the court did not abuse its discretion in finding Mother still failed to show additional reunification services would be in Minors' best interest. Minors were doing well in the care of relatives with whom they had been placed for more than two years, they had sporadic contact with Mother during this time, the two oldest children no longer wanted to visit Mother, and the behavior of the two younger children worsened after visits. Under the umbrella of Minors' best interests (i.e., not presented as a freestanding contention of error), Mother additionally argues it was in Minors' best interests to be enrolled in the Cherokee Nation and had the Department facilitated that earlier, "the case plan and support for Mother and [Minors] would have been different and more tailored to this family's needs." The argument is impermissibly speculative and in any event does not undermine the juvenile court's discretionary determination of what is in Minors' best interests now.[7]

---

[6] The juvenile court reinstated reunification services for L.R.'s father, M.R., on the same date.

[7] By virtue of the manner in which the argument is raised in this appeal, nothing we say in this opinion expresses a view on the merit, if any, of a direct Cal-ICWA challenge to any

11

*A.    Legal Framework*

Section 388 "accords a parent the right to petition the juvenile court for modification of any of its orders based upon changed circumstances or new evidence.  [Citations.]  To obtain the requested modification, the parent must demonstrate both a change of circumstance or new evidence, and that the proposed change is in the best interests of the child.  [Citations.]" (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.)  Where, as here, reunification services have been terminated, "the parents' interest in the care, custody and companionship of the child are no longer paramount" and a court considering a child's best interest in the context of a section 388 petition "must recognize this shift of focus . . . ." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; accord *Alayah J.*, *supra*, at 478; *In re K.L.* (2016) 248 Cal.App.4th 52, 62.)

The juvenile court may deny a petition under section 388 without holding a hearing if the petitioner fails to make a prima facie showing as to either element.  (*In re Christopher L.* (2022) 12 Cal.5th 1063, 1080; *In re R.F.* (2023) 94 Cal.App.5th 718, 728.)  In deciding whether a prima facie showing has been made, "we may consider the entire factual and procedural history of the case." (*In re Daniel F.* (2021) 64 Cal.App.5th 701, 711.)   Our review of the juvenile court's ruling is for abuse of discretion. (*Ibid.*; *In re R.F.*, *supra*, at 728; *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079.)

---

subsequent orders the juvenile court may have made subsequent to the order at issue in this appeal.

B.  *The Juvenile Court Did Not Abuse Its Discretion in Denying Mother's Section 388 Petition*

Although some of the purported changes cited in Mother's November 2023 petition pre-date the juvenile court's May 2023 order terminating family reunification services, we shall assume for the sake of argument that Mother's continued sobriety and participation in mental health services reflect a change in circumstances.  We hold, however, that Mother did not make a prima facie showing that reinstating family reunification services would be in Minors' best interest.

The two older children, J.N.M. and J.M.M., were strongly bonded with their paternal grandparents after two years of living with them, they wanted to be adopted, and they no longer wanted contact with Mother.  J.N.M. had refused visits with Mother since 2022—when Mother told him she would not seek to regain custody of him—and J.M.M.'s relationship with Mother deteriorated over time.  Mother cites an August 2022 status review report mentioning, among other things, that she and J.M.M. enjoyed positive visits and J.M.M. did not feel "normal" outside her care, but more recent reports detail J.M.M.'s adverse response to visits with Mother and J.M.M.'s concern that "you never know what [Mother] will say or do."[8]  Mother and J.M.M.

---

[8]  Mother also references an observation in the August 2022 report that J.M.M. acted out when J.N.M. discussed his treatment in Mother's care.  Viewing this evidence in the context of "the entire factual and procedural history of the case" (*In re Daniel F.*, *supra*, 64 Cal.App.5th at 711), J.M.M.'s behavior in 2022 is consistent with her worry in 2023 that Mother expected her to keep secrets.  The point, if anything, therefore appears to

had already participated in conjoint counseling, with J.M.M. reporting that Mother failed to listen to her. There is no evidence that additional reunification services would benefit J.N.M. and J.M.M., and ample evidence to the contrary.

The fact that the two younger siblings, N.M. and L.R., had a more positive relationship and some apparent bond with Mother does not show that additional reunification services would be in their best interests. Notwithstanding visits in which Mother appeared to behave appropriately, there was evidence that the children's behavior worsened after visits. But even if the children's visits with Mother were unambiguously beneficial, "a parent's petition for . . . an order . . . reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.) Mother made no such showing. N.M. and L.R. had lived with their maternal aunt for more than two years—since N.M. was five years old and L.R. was two years old. There were extended periods during which Mother had no contact with N.M. and L.R.—to the point where, at one visit, the Department reported N.M. and L.R. did not recognize her. Further, as of September 2023, L.R. said "she likes living with her aunt" and N.M. said he was "doing 'good'" and "'fine' staying with his aunt if he [could not] return to [Mother]." N.M.'s statements that he wanted to live with Mother were also disclosed (by his caregiver) in the context of her concerns about Mother coaching the children.

---

undermine Mother's argument that reinstating reunification services would be in J.M.M.'s best interest.

Mother's related argument that Minors' eligibility for membership in the Cherokee Nation shows additional reunification services would be in their best interest also lacks merit. Even assuming Mother did not forfeit the point because she did not raise it in her section 388 petition, her counterfactual claim that the nature of services provided would have been different "if [the Department] had done its job and assisted Mother and the children's [tribal] enrollment, as ordered, at the inception of this case" is too speculative; we have no way to know how services provided after an earlier tribal enrollment would have changed (if at all) or how the changes might have affected the children. Even more to the point, the juvenile court was required to evaluate what was in Minors' best interests at the time it ruled (not in the past or at some indefinite point in the future), and Mother has identified no evidence suggesting a delay in provision of "culturally appropriate services" contributed to her inability to make a prima facie showing that providing more reunification services—which would necessarily put off permanency planning—would be in Minors' best interests.

15

DISPOSITION

The juvenile court's order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

HOFFSTADT, P. J.

KIM (D.), J.